GUY B. BAILEY, JR., AND LOIS M. BAILEY, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 10193-78, 12885-80, 21771-81, 4505-82, 3781-85, 18288-85, 18721-85, 18790-85, 18966-85, 19016-85.

Filed March 31, 1988.

---

[1] Cases of the following petitioners are consolidated herewith: Guy B. Bailey, Jr., and Lois M. Bailey, docket Nos. 10193-78 and 4505-82; Norman B. Levy and Helene Lévy, docket No. 12885-80; Henry Milgram and Toby Milgram, docket Nos. 21771-81 and 19016-85; Bernard B. Neuman and Miriam Neuman, docket No. 3781-85; William Milgram and Joyce Milgram, docket No. 18288-85; William Milgram and Harriet Milgram, docket No. 18721-85; William Milgram 18790-85; and Henry Milgram and Carol Milgram, docket No. 18966-85.

*Richard A. Levine, Carlton M. Smith,* and *Albert Rosenblum,* for the petitioners.
*Gerald A. Thorpe,* for the respondent.

## OPINION

SCOTT, *Judge:* These cases were assigned to and heard by Special Trial Judge John J. Pajak, pursuant to the provisions of section 7456 (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, section 1556, 100 Stat. 2755) of the Code and Rule 180 et seq.[2] The Court agrees with and adopts the Special Trial Judge's opinion which is set forth below.

## OPINION OF THE SPECIAL TRIAL JUDGE

PAJAK, *Special Trial Judge:* In these consolidated cases,[3] Respondent determined deficiencies in Federal income taxes due from petitioners as follows:

---

[2] All section references are to the Internal Revenue Code of 1954 as in effect during the taxable years in question, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.

[3] These cases were consolidated for the purpose of deciding issues relating to two partnerships, Persky-Bright Associates and Vista Co. Resolution of these issues will allow entry of decision under Rule 155 in the following docket numbers: Guy B. Bailey, Jr., and Lois M. Bailey, docket No. 4505-82; and Bernard B. Neuman and Miriam Neuman, docket No. 3781-85. Since other issues remain in 8 of the 10 cases which are not automatically resolved by resolution of the issues relating to Persky-Bright Associates and Vista Co., appropriate orders shall be entered for these cases. Jurisdiction shall be retained in the following cases for resolution of issues relating to Barclay Associates, another partnership of which Lester Persky and Richard S. Bright are, directly or indirectly, general partners: Henry Milgram and Toby Milgram, docket Nos. 21771-81 and 19016-85; William Milgram and Harriet Milgram, docket No. 18721-85; William Milgram, docket No. 18790-85; Henry Milgram and Carol Milgram, docket No. 18966-85. The following cases shall be restored to the general docket for trial of issues unrelated to any partnership of which Lester Persky or Richard S. Bright are, directly or indirectly, general partners: Guy B. Bailey, Jr., and Lois M. Bailey, docket No. 10193-78; Norman B. Levy and Helene Levy, docket No. 12885-80; and William Milgram and Joyce Milgram, docket No. 18288-85.

| Petitioners | Docket No. | Taxable year | Deficiency |
|---|---|---|---|
| Bernard B. Neuman | 3781-85 | 1973 | $7,534.40 |
| and Miriam Neuman | | 1974 | 3,451.00 |
| | | 1975 | 1,365.85 |
| | | 1976 | 1,119.50 |
| | | 1977 | 30.81 |
| Guy B. Bailey, Jr., | 10193-78 | 1974 | 18,342.50 |
| and Lois M. Bailey | 4505-82 | 1975 | 222,565.42 |
| | | 1976 | 75,325.75 |
| Norman B. Levy | 12885-80 | 1974 | 14,096.00 |
| and Helene Levy | | 1975 | 25,277.00 |
| | | 1976 | 46,815.00 |
| Henry Milgram | 21771-81 | 1971 | 2,059.00 |
| and Toby Milgram | | 1972 | 2,059.00 |
| | | 1974 | 38,153.00 |
| | 19016-85 | 1975 | 2,447.00 |
| | | 1976 | 90,419.00 |
| | | 1977 | 1,212.00 |
| Henry Milgram | 18966-85 | 1978 | 5,754.00 |
| and Carol Milgram | | 1979 | 1,210.00 |
| William Milgram | 18721-85 | 1971 | 4,975.00 |
| and Harriet Milgram | | 1974 | 25,887.00 |
| | | 1975 | 77,872.00 |
| | | 1976 | 160,000.00 |
| | | 1977 | 2,177.00 |
| William Milgram | 18790-85 | 1978 | 7,522.00 |
| | | 1979 | 3,146.00 |
| William Milgram | 18288-85 | 1980 | 83,823.00 |
| and Joyce Milgram | | | |

Respondent also determined an addition to tax under section 6651(a)(1) in the amount of $1,834.25 for the year 1974 in docket No. 10193-78.

Certain issues in these cases were severed and consolidated for the purposes of trial, briefing, and opinion. These issues arise out of activities of two partnerships, Persky-Bright Associates (Persky-Bright) and Vista Co. (Vista).

After concessions, the issues for decision are: (1) Whether the partnerships purchased interests in motion pictures, and, if so, the nature of their purchases; (2) whether the partnerships constituted activities not engaged in for profit within the meaning of section 183; (3) whether the nonrecourse notes should be included in the basis of the partnerships' interests in the motion pictures, and, if not, the determination of the basis of the partnerships' interests; (4) whether the partnerships may deduct interest on the

nonrecourse notes; (5) whether the partnerships are entitled to depreciation deductions under the income-forecast method; (6) whether each petitioner is entitled to an investment credit; and (7) whether petitioners are subject to an increased rate of interest under section 6621(d) (now section 6621(c))[4] for substantial underpayments attributable to tax-motivated transactions.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioners Guy B. Bailey, Jr., and Lois M. Bailey resided in Coral Gables, Florida, when their petition was filed. Petitioners Norman B. Levy and Helene Levy resided in Woodland Hills, California, at the time their petition was filed. Petitioners Bernard B. Neuman and Miriam Neuman resided in Skokie, Illinois, when their petition was filed. Petitioners Henry Milgram and Toby Milgram resided in Penn Valley, Pennsylvania, and Bala Cynwyd, Pennsylvania, respectively, at the time their petition was filed. Petitioners Henry Milgram and Carol Milgram resided in Penn Valley, Pennsylvania, at the time their petition was filed. Petitioners William Milgram and Harriet Milgram resided in Boca Raton, Florida, and Elkins Park, Pennsylvania, respectively, at the time their petition was filed. Petitioner William Milgram resided in Boca Raton, Florida, when his petition was filed. Petitioners William Milgram and Joyce Milgram resided in Boca Raton, Florida, when their petition was filed.

On their pertinent Federal income tax returns, petitioner-husbands as partners in Persky-Bright and Vista claimed deductions and investment tax credits. Respondent disallowed the claimed deductions and investment credits on a variety of grounds.

---

[4]Former sec. 6621(d) was redesignated as sec. 6621(c) pursuant to sec. 1511(c), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744. We will use the reference to the Internal Revenue Code as redesignated and amended.

## *Background*

Persky-Bright and Vista are two of a number of film partnerships organized by Lester Persky (Persky) and Richard Bright (Bright). Persky, after an advertising and public relations career, was involved with the production of several motion pictures in the late 1960s. Bright was experienced in the fields of taxation and cash management, and was a financial advisor who specialized in agricultural and real estate investments before joining forces with Persky. They met in 1971, when Persky was attempting to find an American distributor for two foreign films. They became the general partners of a limited partnership which purchased the two films. Persky and Bright were not satisfied with the independent distributor of those films.

In 1973, Columbia Pictures, Inc. (Columbia), a major distributor, was in desperate financial condition, nearing bankruptcy. It had experienced operating losses in excess of $100 million during the prior 3 years and had an approximate net worth of only $8 million. Columbia was over $250 million in debt and the banks refused to extend any further credit. The banks insisted on a change of management.

Burton Marcus (Marcus), a tax lawyer, became the vice president and general counsel of Columbia. He and several other new operating officers determined that Columbia's most potent source of cash was through the distribution of films and that they would not give up the right to distribute their films. They estimated that approximately $40 million was needed to produce the films they wanted to distribute. Columbia had $25 million at the time. To raise part of the difference, Columbia sold its corporate headquarters building at a bargain price of $11 million, its television stations in Salt Lake City, New Orleans, and Puerto Rico, and its Learning Corporation.

To raise additional funds, Marcus decided to develop a program to sell films.[5] After doing a cost analysis, Marcus decided that he would price the films at warranted cost plus at least a 25-percent markup.

---

[5] Use of terms such as "sell," "buy," "purchase," "acquire," "interest," "principal," and "price" should not be construed as carrying any conclusion as to the legal effect of the documents or transactions involved herein.

The first film Columbia decided to sell was "Summer Wishes, Winter Dreams." Marcus learned that Persky and Bright wanted to buy the film. In late 1973, Marcus met with Persky and Bright to arrange the sale of "Summer Wishes, Winter Dreams" to Persky-Bright. Persky and Bright did not have any independent projections of profit made before contracting for the film.

In 1974, Marcus met with Persky and Bright to arrange the sale of a package of four films to Vista, the other partnership involved in this case. Again, Persky and Bright did not have any independent projections of profit made before contracting to buy the film package.

Ultimately, Columbia sold 10 to 15 films to partnerships organized by Persky and Bright.

## I

### *Persky-Bright*

Persky-Bright is a New York limited partnership formed on October 15, 1973. Persky and Bright are the general partners, each owning a 2.5-percent interest in the profits and losses and a 0.5-percent interest in the investment tax credit and 2.5-percent interest in the cash-flow of the partnership.

Persky and Bright prepared an informal offering memorandum for prospective partners. The memorandum was similar to the offering memorandum prepared in connection with the formation of the Vista partnership.

During the years in issue, the limited partners held in aggregate a 95-percent interest in the profits and losses and a 99-percent interest in the investment tax credit. The total capital contributed to Persky-Bright by its partners was $465,000, of which $300,000 was contributed in 1973, and $165,000 was contributed in 1974.

The film "Summer Wishes, Winter Dreams" stars Joanne Woodward, Martin Balsam, and Sylvia Sydney. It was produced by Jack Brodsky and directed by Gilbert Cates. The story concerns a middle-aged woman who must cope with the disappointments of her life, such as an unfulfilling marriage, a nagging mother, and a son who is gay. The movie dramatizes the problems and conflicts within the

family. The film was rated PG by the Motion Picture Association of America's Classification and Ratings Administration. Persky and Bright viewed "Summer Wishes, Winter Dreams" prior to its purchase. "Summer Wishes, Winter Dreams" was completed and edited prior to October 15, 1973, the date on which Persky-Bright was formed.

Persky-Bright and Columbia executed simultaneous purchase and distribution agreements with respect to "Summer Wishes, Winter Dreams" on October 15, 1973.

On that date, Persky-Bright entered into an agreement with Columbia to purchase all rights, title, and interest in "Summer Wishes, Winter Dreams" for a total purchase price of $2 million. Pursuant to this agreement, Persky-Bright acquired legal title and ownership of the copyright and negative of the film. The purchase price was based on 133⅓ percent of the amount Columbia warranted as the production cost of the film, which was no less than $1.5 million. In determining negative cost during 1973, a factor of 15 percent of the direct production costs would ordinarily represent overhead costs. Persky-Bright was able to negotiate a 5-percent overhead cost in its purchase agreement. The completed production cost of "Summer Wishes, Winter Dreams" was as follows:

| | |
|---|---:|
| Direct production costs............................ | $1,458,529 |
| 6-Percent completion fee........................... | 87,514 |
| Interest to date of purchase ...................... | 175,000 |
| 15-Percent overhead............................... | 218,779 |
| | 1,939,822 |

The purchase agreement[6] provided for payment of the $2 million purchase price as follows:

| | |
|---|---|
| Upon execution of the agreement........ | $75,000 and delivery of a $1,850,000 nonrecourse promissory note |
| On or before 12/15/73 .................. | $25,000 |
| On or before 9/15/74 ................... | $50,000 |

In addition, Persky-Bright agreed to pay interest on the note on December 15, 1973, and September 15, 1974, in the amounts of $125,000 and $100,000, respectively. The prom-

---

[6]The purchase agreement was amended on or about June 24, 1974, with respect to other provisions.

issory note was due 10 years from the date of the agreement and bore interest at the rate of 12 percent for the first year and 10 percent thereafter.

On October 15, 1973, Persky-Bright paid Columbia $75,000 representing its initial payment of the purchase price. On December 15, 1973, pursuant to the above provisions, Persky-Bright paid $150,000, of which $25,000 represented a payment of the purchase price and $125,000 represented a payment of interest. On September 15, 1974, pursuant to the above provisions, Persky-Bright paid $150,000, of which $50,000 represented payment of the purchase price and $100,000 represented interest.

The nonrecourse note was secured by a first lien on the film and a security interest in the revenues derived from the film. Columbia was to be paid 75 percent of the distributable gross receipts after various deductions until it had received in full the principal amount of the note together with interest, with the remaining 25 percent to be paid to Persky-Bright. All such payments to Columbia were to be credited first to interest and then to principal.

On October 15, 1973, Persky-Bright also entered into an agreement with Columbia under which Columbia had the exclusive right to distribute "Summer Wishes, Winter Dreams" for a period of 10 years. It was anticipated by all concerned that a film would produce most of its revenues in the first 2 years of showing and would have a useful life of about 10 years.

The agreement, as amended on June 24, 1974, gave Columbia an option to extend its distribution rights in perpetuity by paying the greater of $15,000 or the fair market value of the distribution rights at the time the distribution rights were extended. The fair market value for such an extension was to be based on the average price paid by Columbia to extend the term of agreements relating to the distribution of comparable pictures pursuant to which agreements Columbia had acquired the distribution rights for a 10-year term and had exercised a right to extend the term in perpetuity.

The agreement provided that Persky-Bright had the right to approve the overall sales and advertising policy in connection with "Summer Wishes, Winter Dreams" and to

inspect copies of exhibition contracts and details of advertising expenditures and campaigns. Approval of such sales and advertising policies could not be withheld unreasonably. Columbia understood this provision as merely a right of consultation on these matters.

Persky-Bright was also entitled to receive the credit "A Persky-Bright Associates Feature" on all positive prints of the film and the credit "A P-B Associates Feature" in all paid advertising of 16 columnar inches (224 lines) or more.

Under the amended distribution agreement, Columbia was required to collect all film rentals ("gross receipts") from the exhibitors. Columbia was also entitled to reimburse itself from gross receipts for motion picture association dues and taxes. Columbia was then entitled to retain a portion of gross receipts from theatrical and television distribution as a distribution fee as follows:

|  | *$7.5 million* | *Excess of $7.5 million* |
|---|---|---|
| (i) United States | 30% | 35% |
| (ii) England and Canada | 35 | 40 |
| (iii) Rest of the world | 40 | 45 |
| (iv) Outright sale | 10 | 10 |

Columbia was next entitled to retain gross receipts equal to certain third-party participation and deferments as set forth in the agreement.[7] The remaining gross receipts after deduction for the above items were defined in the agreement as "adjusted gross receipts."

Columbia was required to deposit the adjusted gross receipts it collected from the distribution of "Summer Wishes, Winter Dreams" into a special bank account. The bank was instructed that payments from this account were to be made to Columbia and Persky-Bright in accordance with the agreements between the parties.

Pursuant to the amended distribution agreement, Columbia was reimbursed for releasing costs incurred by Columbia for "Summer Wishes, Winter Dreams." The portion reimbursed was calculated under a complex formula which resulted in a deferred reimbursement of the expenses. During 1974, Persky-Bright agreed that after the promis-

---

[7]The third-party participants had net profit participations of approximately 70 percent from "Summer Wishes, Winter Dreams."

sory note was repaid, Columbia would be able to "recoup off the top" any releasing costs thereafter incurred by it.

Columbia and Vista entered into a series of temporary extensions of the terms of the distribution agreement and the due date of Persky-Bright's promissory note for "Summer Wishes, Winter Dreams." As of the date of trial, Columbia and Persky-Bright had agreed to extend the terms of the distribution agreement and the due dates of these nonrecourse notes in order to give themselves sufficient time to establish the fair market value of the extended distribution rights of the film.

"Summer Wishes, Winter Dreams" was first exhibited to the public on October 17, 1973. It was ultimately exhibited throughout the United States, Canada, and in more than 47 other countries.

Columbia maintained lists of play dates at which "Summer Wishes, Winter Dreams" was scheduled to be exhibited. In addition, Columbia pictures maintained records of the daily gross receipts from the film for each theater at which the film was exhibited.

Columbia furnished to Persky-Bright distribution statements reflecting gross receipts from "Summer Wishes, Winter Dreams" and the application of gross receipts in payment of Motion Picture Association taxes and dues, distribution fees, pre-releasing costs, and releasing costs. Such distribution statements were prepared monthly commencing with the period ended December 29, 1977, and quarterly commencing with the period ended November 27, 1976.

The schedule beginning on page 568 summarizes the gross receipts and cash expenses attributable to the distribution of the motion picture "Summer Wishes, Winter Dreams," as set forth in the distribution statements for the film and as reported by Persky-Bright on its Federal partnership income tax returns for the taxable years 1973 through 1984, as well as the application of these receipts to principal and interest on the nonrecourse note.

## SUMMER WISHES, WINTER DREAMS

| | 1973 | 1974 | 1975 | 1976 |
|---|---|---|---|---|
| I. *Gross receipts* | | | | |
| United States: | | | | |
| Theatrical | $150,000 | $849,037 | $204,771 | ($1,956) |
| Nontheatrical and trailer | 0 | 63,949 | 20,300 | 2,837 |
| Network television | 0 | 0 | 0 | 0 |
| Pay television | 0 | 0 | 33,865 | 1,862 |
| Television syndication | 0 | 0 | 0 | 0 |
| | $150,000 | $912,986 | $258,936 | $2,743 |
| Foreign | 0 | 165,754 | 166,995 | 54,058 |
| Total gross receipts | 150,000 | 1,078,740 | 425,931 | 56,801 |
| II. *Expenses before debt service* | | | | |
| Distribution fees | 0 | 368,975 | 127,972 | 18,851 |
| Releasing costs | 0 | 224,635 | 83,327 | 19,132 |
| Motion Picture Association dues and taxes | 0 | 23,832 | 14,843 | 4,610 |
| Total | 0 | 617,442 | 226,142 | 42,593 |
| Distributable gross receipts | 150,000 | 461,298 | 199,789 | 14,208 |
| III. *Promissory note payments* | | | | |
| Principal | 34,000 | 277,730 | 38,092 | 0 |
| Interest | [1]78,500 | [2]46,419 | 133,575 | 10,656 |
| | $112,500 | 324,149 | 171,667 | 10,656 |
| Net after debt service | 37,500 | 137,149 | 28,122 | 3,552 |

[1]Does not include $125,000 interest paid by Persky-Bright to Columbia Pictures by check on Dec. 15, 1973.
[2]Does not include $100,000 interest paid by Persky-Bright to Columbia Pictures by check on Sept. 15, 1974.

## Summer Wishes, Winter Dreams

| | 1977 | 1978 | 1979 | 1980 |
|---|---|---|---|---|
| **I. Gross receipts** | | | | |
| United States: | | | | |
| Theatrical | ($15,880) | $803 | $1,387 | ($1,408) |
| Nontheatrical and trailer | 3,778 | 1,359 | 706 | 761 |
| Network television | 0 | 750,000 | 0 | 0 |
| Pay television | 480 | 320 | 126 | 0 |
| Television syndication | 0 | 111,120 | 75,089 | 56,329 |
| | ($11,622) | $863,602 | $77,308 | $55,682 |
| Foreign | 41,271 | 34,415 | 35,146 | 42,832 |
| Total gross receipts | 29,649 | 898,017 | 112,454 | 98,514 |
| **II. Expenses before debt service** | | | | |
| Distribution fees | 11,935 | 271,107 | 34,907 | 32,045 |
| Releasing costs | 8,209 | 248,106 | 34,668 | 36,446 |
| Motion Picture Association dues and taxes | (4,182) | 1,225 | 3,565 | 3,317 |
| Total | 15,962 | 520,438 | 73,140 | 71,808 |
| Distributable gross receipts | 13,687 | 377,579 | 39,314 | 26,706 |
| **III. Promissory note payments** | | | | |
| Principal | 0 | 0 | 0 | 0 |
| Interest | 10,266 | 283,184 | 29,483 | 20,029 |
| Net after debt service | 3,421 | 94,395 | 9,831 | 6,677 |

## Summer Wishes, Winter Dreams

| | 1981 | 1982 | 1983 | 1984 |
|---|---|---|---|---|
| I. *Gross receipts* | | | | |
| United States: | | | | |
| Theatrical | $100 | $25 | 0 | 0 |
| Nontheatrical and trailer | 56 | 979 | $391 | $985 |
| Network television | 0 | 0 | 0 | 0 |
| Pay television | 0 | 0 | 0 | 0 |
| Television syndication | 36,271 | 22,122 | 10,947 | 6,370 |
| | $36,427 | $23,126 | $11,388 | $7,355 |
| Foreign | 51,195 | 67,472 | 6,048 | 11,982 |
| Total gross receipts | 87,622 | 90,598 | 17,386 | 19,337 |
| II. *Expenses before debt service* | | | | |
| Distribution fees | $27,552 | 34,254 | 5,898 | 5,574 |
| Releasing costs | 29,197 | 30,841 | 6,635 | 5,741 |
| Motion Picture Association | | | | |
| dues and taxes | 8,950 | 1,764 | (278) | 3,560 |
| Total | 65,699 | 66,859 | 12,255 | 14,875 |
| Distributable gross receipts | 21,923 | 23,739 | 5,131 | 4,462 |
| III. *Promissory note payments* | | | | |
| Principal | 0 | 0 | 0 | 0 |
| Interest | 16,450 | 17,803 | 3,848 | 3,346 |
| Net after debt service | 5,473 | 5,936 | 1,283 | 1,116 |

## SUMMER WISHES, WINTER DREAMS

|  |  | Cumulative (1973-1984) |
|---|---|---|
| I. *Gross receipts* | | |
| United States: | | |
| Theatrical | $1,186,879 | |
| Nontheatrical and trailer | 96,101 | |
| Network television | 750,000 | |
| Pay television | 36,653 | |
| Television syndication | 318,248 | $2,387,881 |
| Foreign | | 677,168 |
| Total gross receipts | | 3,065,049 |
| II. *Expenses before debt services* | | |
| Distribution fees | | 939,070 |
| Releasing costs | | 726,937 |
| Motion Picture Association dues and taxes | | 61,206 |
| Total | | 1,727,213 |
| Distributable gross receipts | | 1,337,836 |
| III. *Promissory note payments* | | |
| Principal | 349,822 | |
| Interest | [1]653,559 | 1,003,381 |
| Net after debt service | | 334,455 |

[1]Does not include $225,000 interest paid by Persky-Bright to Columbia Pictures by checks in 1973 and 1974.

Persky-Bright kept its books and records at the offices of the Persky-Bright organization in New York. In 1976, Sherry Polen (Polen), a certified public accountant, was employed by the organization. At that time, in addition to Persky and Bright and their secretaries, the organization employed an assistant to Persky, a controller, and a story editor. Persky, Bright, and Polen reviewed the distribution statements for mathematical errors and charges plainly inconsistent with the terms of the purchase and distribution statements.

In September 1975, Persky-Bright retained the services of Sidney Finger of Solomon & Finger to audit the records of Columbia on behalf of Persky-Bright. Solomon & Finger conducted periodic audits of the records of Columbia concerning "Summer Wishes, Winter Dreams." As a result of these audits, Persky-Bright made claims against Columbia for additional money due. Prior to 1983, claims were made with respect to the underreporting of gross receipts and the charging of improper releasing costs, Motion Picture Association dues, foreign taxes, and distribution

fees. As a result of these claims, Columbia made adjustments to its distribution statements for "Summer Wishes, Winter Dreams."

Persky-Bright retained the services of Margold, Ersken & Wang and, later, Frank Zimmerman & Co., P.C., to prepare annual financial statements for Persky-Bright.

During the years 1973 through 1984, Persky-Bright incurred and paid the following management fees and administration expenses, professional fees, travel and entertainment expenses, and sundry expenses:

| Year | Management fees | Administrative, professional, travel, and sundry |
|------|-----------------|--------------------------------------------------|
| 1973 | $75,000 | $13 |
| 1974 | 0 | 6,364 |
| 1975 | 15,000 | 2,971 |
| 1976 | 0 | 3,510 |
| 1977 | 0 | 1,591 |
| 1978 | 0 | 5,517 |
| 1979 | 0 | 1,686 |
| 1980 | 0 | 1,273 |
| 1981 | 0 | 4,849 |
| 1982 | 0 | 8,019 |
| 1983 | 0 | 2,951 |
| 1984 | 0 | 3,803 |

The parties stipulated that if the Court determines that Persky-Bright was engaged in an activity for profit, the management fees shall be treated as follows: $18,000 shall be treated as nondeductible, nonamortizable syndication expenses; $18,000 shall be treated as ordinary and necessary expenses fully deductible in 1973; $27,000 shall be added into the partnership's basis for the film "Summer Wishes, Winter Dreams" in 1973; and $27,000 shall be capitalized and amortized annually in equal amounts over 10 years, beginning in 1973. They also stipulated that if the Court determined that Persky-Bright was engaged in an activity for profit, the other listed expenses would be deductible in the years paid.

Persky-Bright is entitled to employ the income-forecast method of computing depreciation. On its partnership tax returns, Persky-Bright employed a variation of the income-forecast method of depreciation. Vista requested from Columbia estimates of Columbia's total gross receipts and distribution expenses. Columbia's estimates included esti-

mated television gross receipts and television releasing costs. Persky-Bright used Columbia's estimates with several modifications to calculate depreciation. Persky-Bright did not include Columbia's estimated television gross receipts and television releasing costs in its calculations. At the end of each taxable year, Persky-Bright estimated future net receipts of "Summer Wishes, Winter Dreams." In calculating net receipts, Persky-Bright subtracted from gross receipts estimated distribution fees, releasing expenses, and Motion Picture Association dues and taxes.

Persky-Bright arrived at the amount it deducted as depreciation in the following manner: first, it multiplied the $2 million purchase price of "Summer Wishes, Winter Dreams" by a fraction, the numerator of which was the net receipts received by the partnership from the film in that year, plus all previous years, and the denominator of which was the estimated future net receipts, plus the total net receipts received in that year and all previous years; and second, it subtracted from this amount all depreciation previously claimed. Depreciation deducted by Persky-Bright was computed by the Persky-Bright organization and the amounts computed were then given to an independent accounting firm which prepared the returns.

For the taxable years 1973-84, Persky-Bright filed Federal income tax returns reporting the following amounts of income and expenses:

| Year | Income | Interest | Depreciation | Other expenses[1] | Income (loss) |
|---|---|---|---|---|---|
| 1973 | $150,000 | [2]$203,500 | $510,000 | $75,013 | ($638,513) |
| 1974 | 1,078,740 | [3]146,419 | 757,200 | 623,806 | (448,685) |
| 1975 | 425,931 | 133,575 | 246,400 | 244,113 | (198,157) |
| 1976 | 56,801 | 10,656 | 142,000 | 46,103 | (141,958) |
| 1977 | 29,649 | 10,266 | 0 | 17,553 | 1,830 |
| 1978 | 898,071 | 283,184 | 122,000 | 525,955 | (33,122) |
| 1979 | 112,454 | 29,483 | 1,800 | 74,826 | 6,345 |
| 1980 | 98,514 | 20,029 | 0 | 73,081 | 5,404 |
| 1981 | 87,622 | 16,450 | 10,000 | 70,548 | (9,376) |
| 1982 | 91,808 | 17,803 | 32,600 | 74,878 | (33,473) |
| 1983 | 17,945 | 3,848 | 19,600 | 15,484 | (20,987) |
| 1984 | 19,343 | 3,346 | 53,800 | 18,678 | (56,481) |
| Total | 3,066,878 | 878,559 | 1,895,400 | 1,860,038 | (1,567,173) |

[1]Includes management fees, administrative expenses, professional fees, distribution fees, Motion Picture Association dues and taxes, and releasing costs.

[2]Includes $125,000 interest paid by Persky-Bright to Columbia Pictures on Dec. 15, 1973.

[3]Includes $100,000 interest paid by Persky-Bright to Columbia Pictures on Sept. 15, 1974.

"Summer Wishes, Winter Dreams" constitutes a "qualified film" within the meaning of section 48(k)(1)(B). When Persky-Bright placed the film in service on October 17, 1973, it constituted "new section 38 property (determined without regard to useful life)" as to Persky-Bright within the meaning of section 48(k)(1)(A)(i).

For the taxable years 1973 through 1984, Persky-Bright made cash distributions to the partners as follows:

| | |
|---|---:|
| 1973 | 0 |
| 1974 | $134,007 |
| 1975 | 38,468 |
| 1976 | 18,418 |
| 1977 | 3,168 |
| 1978 | 74,158 |
| 1979 | 10,529 |
| 1980 | 0 |
| 1981 | 0 |
| 1982 | 15,921 |
| 1983 | 0 |
| 1984 | 0 |
| Total | 294,669 |

Petitioner Bernard Neuman (Neuman) acquired a limited partnership interest in Persky-Bright in 1973 and contributed $7,750 to the partnership's capital. During 1973 and 1974, Neuman held a 1.583-percent interest in the profits and losses and a 1.65-percent interest in the investment tax credit of Persky-Bright. During 1975 and 1976, Neuman held a 1.577-percent interest in the profits and losses of Persky-Bright.

On their Federal income tax returns, petitioners Bernard and Miriam Neuman deducted the following amounts as Bernard Neuman's distributive share of loss from Persky-Bright:

| | |
|---|---:|
| 1973 | ($10,108) |
| 1974 | (7,103) |
| 1975 | (3,125) |
| 1976 | (2,239) |

The 1979 Federal income tax return was not placed in evidence. On their 1973 Federal income tax return, petitioners Bernard and Miriam Neuman claimed $2,310 as Bernard Neuman's distributive share of the investment tax credit of Persky-Bright. The 7-percent investment tax credit was

based on the $2 million purchase price of "Summer Wishes, Winter Dreams."

## II

### *Vista*

Vista is a New York limited partnership formed by Persky and Bright in November 1974. The partnership's stated purposes were to acquire four films and render production services with respect to a fifth film.[8] Richless Associates is a partnership whose partners are Persky and Bright. During the years in issue, Richless Associates was the sole general partner of Vista, owning a 4.94-percent interest in the profits, losses, and investment tax credit of Vista and a 10.29-percent interest in those items as a limited partner, for a total of 15.23 percent.

In connection with the organization of the partnership, Persky and Bright prepared a private placement memorandum dated December 26, 1974, for prospective partners. The memorandum contained the following statements:

INVESTMENT IN THE UNITS INVOLVES A HIGH DEGREE OF RISK, IS SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL FINANCIAL MEANS WHO CAN AFFORD TO SUSTAIN A TOTAL LOSS OF THEIR INVESTMENT AND IS NOT RECOMMENDED FOR PERSONS WHOSE MARGINAL FEDERAL INCOME TAX BRACKETS AFTER TAKING INTO ACCOUNT THE LOSSES IN-CURRED AS A RESULT OF SUCH INVESTMENT IS NOT AT LEAST 50%.

\* \* \* \* \* \* \*

The motion picture business is highly speculative and has historically involved a substantial degree of risk. The ultimate profitability of the Pictures to the Partnership will depend on many factors over which the Partnership will have no control, e.g., unpredictable critical reviews and changeable public tastes which cannot be ascertained in advance with any degree of certainty. Even if the Pictures were critical or artistic successes, there is no assurance that the Pictures will be economic successes.

\* \* \* \* \* \* \*

---

[8]The parties stipulated that the income and expenses of this fifth film are not in issue and basically presented the case as if Vista owned only the four films, and we shall so address this matter.

In order for the Partnership to recoup its cash outlay (representing its down payment and its advance payment of interest) in connection with the purchase of each of the Acquired Pictures, the General Partners estimate that Gross receipts (as said term is hereinafter defined, see p. 20) in the following amounts will have to be generated from the distribution of each of the Acquired Pictures:

| Acquired picture | Cash outlay of partnership | Estimated worldwide gross receipts required to recoup cash outlay |
|---|---|---|
| Streisand | $2,000,000 | $21,000,000 |
| Bronson | 1,250,000 | 11,000,000 |
| Beatty | 1,200,000 | 12,000,000 |
| Hackman | 1,200,000 | 10,500,000 |

There is no assurance, however, that the estimated amount of Gross Receipts set forth above for each Acquired Picture will be attained.

*    *    *    *    *    *    *

The Partnership has entered into separate agreements (hereinafter separately referred to as the "Purchase Agreement" and collectively referred to as the "Purchase Agreements") with (i) Gelderse Belleggingsmattschappij N.V. ("Gelderse") for the purchase of the Streisand Picture; (ii) Zeeuwse Belleggingsmaatschappij N.V. ("Zeeuwse") for the purchase of the Bronson Picture; (iii) Columbia for the purchase of the Beatty Picture; and (iv) Gelderse for the purchase of the Hackman Picture. Gelderse and Zeewuse have assigned their entire respective interests in the Purchase Agreements to Columbia and together with Columbia are herein sometimes individually referred to as the "Seller" and collectively referred to as the "Sellers". The Partnership and Columbia have entered into agreements amending the Purchase Agreements with Gelderse and Zeeuwse in certain respects.

In addition, the private placement memorandum contains nine pages of discussion of the Federal tax consequences if the Federal tax laws are changed or if the Internal Revenue Service successfully challenges the deductions and credits claimed by the partnership on its Federal income tax returns. A 46-page opinion letter of a law firm, which discusses the Federal tax consequences associated with an investment in Vista, is part of the memorandum. That opinion letter states in part as follows:

The motion picture industry is highly speculative and the success or failure of any one motion picture is difficult if not impossible to predict because of many factors. The amount expended on the production of a motion picture usually is no indication of whether or not the motion picture will be profitable. You have represented to us that substantial gross receipts will be required in order to produce sufficient revenues so

that the Partnership can recoup the amounts expended for its projects and to repay the indebtedness incurred. You have also informed us that prior motion pictures in which Charles Bronson, Barbra Streisand, Warren Beatty and Gene Hackman have starred, have been highly successful and that at the present time it is impossible to predict how Daybreak will do at the box office.

*　·　*　　*　　*　　*　　*　　*

You have represented to us that the indebtedness incurred with respect to the Acquired Pictures was incurred pursuant to arm's length negotiation between unrelated parties. As a general rule, fair market value is defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having knowledge of all relevant facts. You have also represented to us that the price to be paid for the Acquired Picture is based on what you in your experienced opinion considered each Acquired Picture to be worth after viewing each Acquired Picture, receiving and reviewing projections of revenue from each Acquired Picture, and evaluating the stature of the stars, the producer and the director. While all of the foregoing indicates arm's length dealing in establishing that the non-recourse indebtedness does not exceed fair market value, there can be no guarantee that such determination will not be questioned by the Service.

Contrary to the statement in the opinion letter, neither Persky, Bright, nor anyone else acting on behalf of Vista viewed each acquired picture prior to purchase. The memorandum, itself, contains no projections of the gross receipts the promoters expected each film to generate or the amount of expenses expected to be incurred. Neither Persky nor Bright sought independent expert advice as to the potential economic success of the four films.

In late summer or early fall of 1974, Persky and Bright met with representatives of Columbia to discuss the acquisition by Vista of "Funny Lady," "Breakout," "Shampoo," and "Bite the Bullet." These films were in the process of being made. Vista and Columbia anticipated that "Funny Lady" would be the most successful of these films. "Shampoo" was much more successful than anticipated by Vista and Columbia.

The principal photography was finished and the films were substantially completed prior to December 20, 1974, the date of purchase. After that date, the films were in post production. During post production, a film is edited, the sound track and sound effects are added, the dialogue is put

on the soundtrack, the film is screened for the motion picture board, a composite print is manufactured which combines the separate soundtracks and optical tracks and adds the opening titles and closing credits, the film is previewed for audiences, positive prints are manufactured, and the sound for musical numbers is recorded. During post production, up to six or seven different versions of a film may be put together. Post production takes at least 6 months.

"Funny Lady" stars Barbra Streisand, James Caan, Roddy McDowall, Omar Sharif, and Ben Vereen. It was produced by Ray Stark and directed by Herbert Ross. "Funny Lady" is a sequel to the movie "Funny Girl" which also stars Barbra Streisand and Omar Sharif and was produced by Ray Stark and directed by Herbert Ross. The film is about the life of Fanny Brice.

"Breakout" stars Charles Bronson, Jill Ireland, Robert Duvall, John Huston, Randy Quaid, and Sheree North. It was produced by Robert Chartoff and Irwin Winkler, and directed by Tom Gries. "Breakout" is based on a true story of an innocent man sent to a Mexican prison as a result of a frameup engineered by his wealthy grandfather. After several unsuccessful attempts to escape, the prisoner is rescued.

"Shampoo" stars Warren Beatty, Julie Christie, Goldie Hawn, Jack Warden, Lee Grant, Tony Bill, and Carrie Fisher. It was produced by Warren Beatty and directed by Hal Ashby. The story concerns the illicit romantic entanglements of a Hollywood hairdresser.

"Bite the Bullet" stars Gene Hackman, Candice Bergen, James Coburn, Jan-Michael Vincent, Ben Johnson, Ian Bannen, and Dabney Coleman. "Bite the Bullet" is a story involving a 700-mile horserace across Nevada and New Mexico in about 1905.

After release of the films, the Motion Picture Association of America's Classification and Rating Administration rated Shampoo "R" and the other films "PG."

Persky and Bright negotiated with representatives of Columbia for the purchase of all rights, title, and interest in each of the four films in the Vista package. The negotiations resulted in a total purchase price of $29 million for the

four films. Under the purchase agreements, Vista acquired legal title and ownership of the copyright and negative of each of the four films from Columbia. Under the distribution agreements, Columbia retained proprietary rights in each of the four films.

On December 20, 1974, Columbia executed agreements with Gelderse Belleggingsmattschappij N.V. (Gelderse) with respect to "Funny Lady" and "Bite the Bullet" and with Zeeuwse Belleggingsmattschappij N.V. (Zeeuwse) with respect to "Breakout" (then titled "Ten Second Jailbreak"), whereby those parties agreed to transfer all of their right, title, and interest in those films to any third party approved by Columbia. On December 20, 1974, at the direction of Columbia, Gelderse and Zeeuwse executed purchase agreements with Vista to transfer legal title and ownership of the copyright and negative of the respective films to Vista. Vista also executed nonrecourse promissory notes to Gelderse and Zeeuwse pursuant to the purchase agreements for each of the three films. On December 20, 1974, Gelderse and Zeeuwse assigned all their respective rights in the purchase agreement and nonrecourse note relating to each of the three films to Columbia. On December 20, 1974, by agreements with Vista, modifying or amending the purchase agreements, Columbia warranted that Vista had acquired "good title to and full ownership in the Picture and all rights therein" for each of the three films.[9]

On December 20, 1974, Columbia and Vista also executed a purchase agreement whereby Vista acquired legal title and ownership of the copyright and negative of Shampoo. Vista executed a nonrecourse promissory note to Columbia pursuant to the purchase agreement.

Columbia warranted that the production cost of each film would be not less than a specified amount. In determining negative cost during 1974, a factor of 15 percent of the direct production costs would ordinarily represent overhead costs. Vista was able to negotiate a 5-percent overhead cost

[9]Gelderse Belleggingsmattschappij N.V. and Zeeuwse Belleggingsmattschappij N.V. were corporations organized under the laws of the Netherlands Antilles. In their supplemental brief, petitioners concede that although these Netherland Antilles corporations held title to the copyrights and negatives of the three films, this was mere nominal ownership since Columbia Pictures completely controlled the production of the three films and negotiated their sale to Vista.

in its purchase agreements. The warranted production cost included the cost of a completion bond or fee, deferments in a specific amount, if any, and an overhead fee of 5 percent of the actual production cost (excluding interest). The purchase price of each film was at least 125 percent of Columbia's warranted production cost of that film.

The completed cost of production of each film was as follows:

| | Direct production cost | 6-Percent completion fee | Interest to date of purchase | Deferments | 15-Percent overhead | Completed production cost |
|---|---|---|---|---|---|---|
| Funny Lady | $8,206,476 | $492,389 | $500,000 | $225,000 | $1,230,971 | $10,654,836 |
| Breakout | 4,616,683 | 277,003 | 300,000 | 75,000 | 692,502 | 5,961,188 |
| Shampoo | 4,286,430 | 257,186 | 390,000 | 200,000 | 642,964 | 5,776,581 |
| Bite the Bullet | 3,852,702 | 231,162 | 390,000 | 125,000 | 577,905 | 5,176,769 |
| Total | | | | | | 27,569,374 |

Vista granted Columbia a security interest in each film and in the proceeds derived from the exhibition of the film. Columbia assigned its security interest in each film to the First National Bank of Boston, a secured creditor of Columbia.

Each of the purchase agreements provided for cash payments, the delivery of a nonrecourse note, and the prepayment of interest. Each of the promissory notes was payable solely out of up to 75 percent of the distributable gross receipts as defined in the distribution agreements, with the remainder of distributable gross receipts payable to Vista. Each of the promissory notes was due 10 years from the date of the agreement and bore interest at a rate of 12 percent per year for the first year and 10 percent thereafter. The promissory notes were not cross-collateralized. Some terms of the purchase agreements are set forth below:

| | Warranted cost | Purchase price | Cash | Nonrecourse note |
|---|---|---|---|---|
| Funny Lady | $8 million | $10.5 million | $1,000,000 | $9.5 million |
| Breakout | 5 million | 6.5 million | 625,000 | 5.875 million |
| Shampoo | 4.8 million | 6.0 million | 600,000 | 5.4 million |
| Bite the Bullet | 4.8 million | 6.0 million | 600,000 | 5.4 million |
| Total | 22.6 million | 29.0 million | 2,825,000 | 26.175 million |

|  | Cash by 12/31/74 | Cash by 3/1/75 | Cash by 6/1/75 | Prepaid interest[10] by 12/31/74 |
|---|---|---|---|---|
| Funny Lady | $150,000 | $600,000 | $250,000 | $1,000,000 |
| Breakout | 100,000 | 375,000 | 150,000 | 625,000 |
| Shampoo | 100,000 | 375,000 | 125,000 | 600,000 |
| Bite the Bullet | 100,000 | 375,000 | 125,000 | 600,000 |
| Total | | | | 2,825,000 |

The total capital contributed to Vista by its partners was $7,840,000. All of such capital was contributed in 1974. Vista paid $5,650,000 to Columbia from its contributed capital in connection with the four films. The $2,825,000 cash payments credited to the purchase price were made in accordance with the terms of the purchase agreements. The payments of the $2,825,000 designated as interest payments were made on December 20, 1974.

On December 20, 1974, Vista also entered into related distribution agreements with Columbia. Each film was designated as the "Photoplay" in the relevant agreement, and Vista granted Columbia "the exclusive license to distribute and otherwise deal with the Photoplay throughout the world in all media" for a term of 10 years or as extended "in perpetuity" in accordance with the terms of the agreements. It was anticipated by all concerned that a film would produce most of its revenues in its first 2 years of showing and would have a useful life of about 10 years. Columbia was granted an option to extend its distribution rights in perpetuity by paying the greater of $25,000 ($40,000 in the case of "Funny Lady") or the so-called fair market value of the extended distribution rights at the time the distribution rights were extended. The fair market value for such an extension was to be based on the average price paid by Columbia to extend the term of agreements relating to the distribution of comparable pictures pursuant to which agreements Columbia had acquired the distribution rights for a 10-year term and had exercised a right to extend the term in perpetuity.

The agreements provide that Vista had the right to approve the overall sales and advertising policy in connection with the four films and to inspect copies of exhibition

---

[10]The interest provisions for all the films except "Shampoo" are contained in separate amendments to the purchase agreements, all executed on Dec. 20, 1974.

contracts and details of advertising expenditures and campaigns, but such approval could not be unreasonably withheld. Columbia understood these provisions as merely rights of consultation on these matters.

Vista was to receive the credit "A Persky-Bright/Vista Feature" in the main titles on all positive prints of each film, or not less than one-half of a card, and in size of type, not less than 35 percent of the size of type used for the title of the film. In all paid advertising, Vista was to receive either of the following credits: "A Persky/Vista Feature" in the same size type as the words "Directed by" in advertisements 100 lines or larger, or "A P-B/Vista Feature" in size of type comparable to Columbia Pictures credit in advertisements of less than 100 lines.

Under each distribution agreement, Columbia was required to collect all film rentals from the exhibitors and other moneys derived from the film. Columbia was to reimburse itself from the collected receipts · for Motion Picture Association dues and taxes paid with respect to the film. The remaining amounts are defined as "gross receipts."

Columbia was next entitled to retain a portion of the gross receipts as distribution fees. The distribution fees to be retained by Columbia in respect of all gross receipts, other than television and outright sales, in millions of dollars were as follows:

| | 32½ Percent | 35 Percent | 43½ Percent | 45 Percent | 50 Percent |
|---|---|---|---|---|---|
| Funny Lady | to $32 | $32 to $80 | | $80 and over | |
| Breakout | to 14 | 14 to 28 | | | $28 and over |
| Shampoo | to 14 | 14 to 35 | $35 and over | | |
| Bite the Bullet | to 14 | 14 to 28 | | 28 and over | |

For each film, the distribution fees to be retained by Columbia attributable to television and outright sales were 32½ percent and 10 percent, respectively.

Columbia was next entitled to retain an amount of the "gross receipts" equal to certain third-party participations

and deferments as set forth in its agreements with Vista.[11] The remaining balance, defined as "adjusted gross receipts," was to be paid into special bank accounts established by Vista. The banks were instructed to pay prereleasing costs in the amounts of $500,000 for "Funny Lady," $150,000 for "Breakout," $200,000 for "Shampoo," and $150,000 for "Bite the Bullet." Thereafter, the banks were to pay releasing costs in accordance with formulas developed by the parties. The balance of the adjusted gross receipts was referred to as "distributable gross receipts." Under the purchase agreements, 75 percent of the distributable gross receipts was to be paid to Columbia and 25 percent was to be retained by Vista, with Vista entitled to the minimum percentages of gross receipts as set forth in the amended purchase agreements.

Under the amended purchase agreements, at no time were the amounts of the distributable gross receipts retained by Vista to be less than the following percentages of gross receipts (after deducting therefrom guild payments):

Funny Lady ........... 6½ Percent of gross receipts after gross receipts equaled $32 million
Breakout .............. 8 Percent
Shampoo ............. 7 Percent
Bite the Bullet ........ 8¼ Percent

The distributable gross receipts were allocated between Columbia and Vista in accordance with the respective purchase agreements, as amended.

Columbia and Vista entered into a series of temporary extensions of the terms of the distribution agreements for all four films and the due dates of Vista's promissory notes for "Funny Lady," "Bite the Bullet," and "Breakout." As of the date of trial, Columbia and Vista had agreed to extend the terms of the distribution agreement and the due dates of these nonrecourse notes in order to give themselves sufficient time to establish the fair market value of the extended distribution rights of the films and to resolve

[11]The respective third-party participants had net profit participations of 57½ percent from "Funny Lady" and net profit participations of 41¾ percent from "Breakout." The gross profit participations of the third-party participants in "Shampoo" and "Bite the Bullet" increase when "breakeven" is reached. "Breakeven" would occur when gross receipts equal total expenses, including production costs, unless otherwise defined as a larger amount of gross receipts.

disputes concerning the amounts due Vista from Columbia uncovered by the partnership's most recent audit of Columbia.

Persky approved the distribution and advertising strategies of the four films. During its first run in New York, Warren Beatty and Persky composed the first advertisement for "Shampoo" which ran in the Sunday New York Times. Persky and Beatty thereafter prepared a series of advertisements.

Shampoo was exhibited to the public, beginning in February 1975. It was exhibited thereafter throughout the United States and Canada as well as worldwide in more than 54 countries. On February 16, 1979, "Shampoo" was first exhibited on network television.

Persky attended openings and screenings of "Funny Lady" in various cities. "Funny Lady" was first exhibited to the public beginning in March 1975 and was exhibited throughout the United States and Canada as well as worldwide in more than 51 countries.

"Breakout" opened simultaneously at more than 1,100 theaters throughout the United States during the week of May 21, 1975.

Persky attended openings and screenings of "Bite the Bullet" in various cities. "Bite the Bullet" was first exhibited to the public beginning in June 1975. "Bite the Bullet" was exhibited throughout the United States and Canada as well as worldwide in more than 67 countries.

Columbia maintained records of the daily box office receipts of the four films for each theater at which the films were exhibited. Columbia furnished to Vista weekly sheets summarizing each day's box office receipts as well as reports of future play dates. Columbia also furnished to Vista distribution statements reflecting gross receipts from each film and the application of gross receipts in payment of motion picture association taxes and dues, distribution fees, releasing costs, prereleasing costs, and third-party gross participations. Such distribution statements were prepared monthly commencing with the period ended April 26, 1975, and quarterly commencing with the period ended June 25, 1977, for "Breakout," "Funny Lady," and "Shampoo." Distribution statements for "Bite the Bullet" were prepared and furnished monthly commencing with the

period ended June 28, 1975, and quarterly commencing with the period ended August 27, 1977.

The schedules beginning on page 587 summarize the gross receipts and cash expenditures attributable to each of the four films as set forth in the distribution statements for the films and as reported by Vista on its Federal partnership income tax returns for the taxable years 1975 through 1984, as well as the application of those receipts to principal and interest on the nonrecourse notes.

Vista kept its books and records at the offices of the Persky-Bright organization in New York. Sherry Polen kept the books and records of Vista. Persky, Bright, and Polen reviewed each distribution statement for mathematical errors and charges plainly inconsistent with the terms of the purchase and distribution agreements.

In 1975, Vista retained the services of Sidney Finger of Solomon & Finger to audit the records of Columbia on behalf of Vista. Solomon & Finger conducted periodic audits of the records of Columbia concerning the four films. As a result of these audits, Vista made claims against Columbia for additional moneys due. Prior to 1983, claims were made with respect to the underreporting of gross receipts and the charging of improper releasing costs, motion picture association dues, foreign taxes, distribution fees, and third-party participations and deferments. As a result, Columbia made adjustments to its distribution statements for the specific film.

In 1983, Sidney Finger performed an audit of Columbia's records with respect to the four films. In 1985, he completed another audit. As a result of the two audits, $3,584,005 of additional claims (in addition to a "Bite the Bullet" breach of warranty claim) were asserted by Vista against Columbia. As of the time of trial, no final resolution of these disputes had yet been achieved.

Vista retained the service of Margold, Ersken & Wang and, later, Frank, Zimmerman & Co., P.C., to prepare annual financial statements for Vista.

During the years 1974 through 1984, Vista incurred and paid the following amounts of management fees, professional fees, and administrative, travel and entertainment, and sundry expenses:

| Year | Management | Professional | Admininistrative, travel, and sundry |
|------|-----------|--------------|--------------------------------------|
| 1974 | $582,936 | $44,841 | $90 |
| 1975 | 652,350 | 4,933 | 427,648 |
| 1976 | 0 | 20,403 | 337,061 |
| 1977 | 0 | 5,381 | 37,634 |
| 1978 | 0 | 6,278 | 14,995 |
| 1979 | 0 | 1,569 | 6,507 |
| 1980 | 0 | 3,840 | 5,511 |
| 1981 | 0 | 1,704 | 6,988 |
| 1982 | 0 | 7,864 | 12,821 |
| 1983 | 0 | 21,092 | 11,201 |
| 1984 | 0 | 44,101 | 1,674 |

The parties stipulated that if the Court determines that Vista was engaged in an activity for profit, the management fees shall be treated as follows: $247,057 shall be treated as nondeductible, nonamortizable syndication expenses, $247,057 shall be treated as ordinary and necessary expenses fully deductible in 1974, $92,646 shall be added to the partnership's basis for each of the four films (a total of $370,584), and $370,586 shall be capitalized and amortized annually in equal amounts over 10 years, beginning in 1974. The parties also stipulated that if the Court determines that Vista was engaged in an activity for profit, the other listed expenses would be deductible in the years paid.

Vista kept its books and filed its partnership returns employing the cash receipts and disbursements method of accounting. For taxable years 1974 through 1984, Vista reported the amounts and expenses shown on page 603 as attributable to the four films.

Vista is entitled to employ the income-forecast method of computing depreciation with respect to the four films in question. On its partnership tax returns, Vista employed the income-forecast method. Vista requested from Columbia estimates of Columbia's total gross receipts, releasing costs, motion picture association dues, and taxes for each film. Columbia included in its estimates for "Breakout" estimated television gross receipts and releasing costs. Vista used Columbia's estimates with several modifications to calculate depreciation for each film.[12] Vista calculated net

---

[12]As of the close of 1975, Vista's estimates of gross receipts for "Shampoo" and "Bite the Bullet" each exceeded Columbia's estimates by $1 million.

## FUNNY LADY

| | 1975 | 1976 | 1977 | 1978 |
|---|---:|---:|---:|---:|
| *I. Gross receipts* | | | | |
| United States: | | | | |
| Theatrical | $14,447,608 | $3,724,448 | $167,390 | $72,891 |
| Nontheatrical and trailer | 72,101 | 335,401 | 113,136 | 14,694 |
| Network television | 0 | 0 | 0 | 0 |
| Pay television | 5 | 0 | 504,512 | 50,125 |
| Total United States | $14,519,714 | $4,059,849 | $785,038 | $137,710 |
| Foreign | 2,245,014 | 1,219,561 | 292,519 | 178,178 |
| Soundtrack royalties | 500,000 | (166,667) | (107,107) | 0 |
| Merchandising | 50,000 | 0 | 0 | 10,000 |
| Total gross receipts | 17,314,728 | 5,112,743 | 970,450 | 325,888 |
| *II. Expenses before debt service* | | | | |
| Distribution fees | 5,541,468 | 1,644,889 | 304,127 | 99,522 |
| Releasing costs | 3,287,316 | 1,208,311 | 300,185 | 104,633 |
| Motion Picture Association dues and taxes | 264,057 | 31,962 | (5,640) | 5,071 |
| Third-party gross participations | 2,345,102 | (1,163,143) | 121,096 | 61,139 |
| Total | 11,437,943 | 1,722,019 | 719,768 | 270,365 |
| Distributable gross receipts | 5,876,785 | 3,390,724 | 250,682 | 55,523 |
| *III. Promissory note payments* | | | | |
| Principal | 4,132,938 | 2,371,633 | 0 | 0 |
| Interest | 274,651 | 171,460 | 188,012 | 41,642 |
| | 4,407,589 | 2,543,093 | 188,012 | 41,642 |
| Net after-debt service | 1,469,196 | 847,631 | 62,670 | 13,881 |

## FUNNY LADY

| | 1979 | | 1980 | | 1981 | | 1982 | |
|---|---:|---:|---:|---:|---:|---:|---:|---:|
| I. *Gross receipts* | | | | | | | | |
| United States: | | | | | | | | |
| Theatrical | ($3,319) | | $2,410 | | $13,243 | | ($4,912) | |
| Nontheatrical and trailer | 45,051 | | 45,013 | | 160 | | (33,529) | |
| Network television | 0 | | 0 | | 1,625,000 | | 625,000 | |
| Pay television | 51,222 | $92,954 | 162,286 | $209,709 | 18,289 | $1,656,692 | 0 | $586,559 |
| Foreign | 63,895 | | 846,006 | | 68,194 | | 67,425 | |
| Soundtrack royalties | 0 | | 0 | | 0 | | 0 | |
| Merchandising | 0 | | 0 | | 0 | | 0 | |
| Total gross receipts | | 156,849 | | 1,055,715 | | 1,724,886 | | 653,984 |
| II. *Expenses before debt service* | | | | | | | | |
| Distribution fees | 49,853 | | 334,231 | | 558,875 | | 212,050 | |
| Releasing costs | 37,965 | | 138,850 | | 29,893 | | 71,173 | |
| Motion Picture Association dues and taxes | 2,065 | | 26,636 | | 4,150 | | 3,670 | |
| Third-party gross participations | 46,837 | | 482,165 | | 1,118,819 | | 318,204 | |
| Total | 136,720 | | 981,882 | | 1,711,737 | | 605,097 | |
| Distributable gross receipts | 20,129 | | 73,833 | | 13,149 | | 48,887 | |
| III. *Promissory note payments* | | | | | | | | |
| Principal | 0 | | 0 | | 0 | | 0 | |
| Interest | 15,097 | | 55,374 | | 11,417 | | 35,110 | |
| Net after debt service | 5,032 | | 18,459 | | 1,732 | | 13,777 | |

## FUNNY LADY

| | 1983 | 1984 |
|---|---:|---:|
| I. *Gross receipts* | | |
| United States: | | |
|   Theatrical | $399 | $636 |
|   Nontheatrical and trailer | 1,863 | 1,205 |
|   Network television | 0 | 250,000 |
|   Pay television | 3,132 | 0 |
| | $5,394 | $251,841 |
| Foreign | 103,405 | 52,604 |
| Soundtrack royalties | 18,774 | 831 |
| Merchandising | 0 | 0 |
|     Total gross receipts | 127,573 | 305,276 |
| II. *Expenses before debt service* | | |
| Distribution fees | 40,274 | 78,006 |
| Releasing costs | 49,922 | 0 |
| Motion Picture Association dues and taxes | 17,606 | 64,754 |
| Third-party gross participations | 5,683 | 162,523 |
|     Total | 113,485 | 305,283 |
| Distributable gross receipts | 14,088 | (7) |
| III. *Promissory note payments* | | |
| Principal | 0 | 0 |
| Interest | 10,565 | 0 |
| Net after debt service | 3,523 | (7) |

## FUNNY LADY

Cumulative (1975-1984)

I. *Gross receipts*

United States:

| | |
|---|---|
| Theatrical | $18,420,794 |
| Nontheatrical and trailer | 595,095 |
| Network television | 2,500,000 |
| Pay television | 789,571 |
| | $22,305,460 |
| Foreign | 5,136,801 |
| Soundtrack royalties | 245,831 |
| Merchandising | 60,000 |
| Total gross receipts | 27,748,092 |

II. *Expenses before debt service*

| | |
|---|---|
| Distribution fees | 8,863,295 |
| Releasing costs | 5,228,248 |
| Motion Picture Association dues and taxes | 414,331 |
| Third-party gross participations | 3,498,425 |
| Total | 18,004,299 |
| Distributable gross receipts | 9,743,793 |

III. *Promissory note payments*

| | |
|---|---|
| Principal | 6,504,571 |
| Interest | [1]803,328 |
| | 7,307,899 |
| Net after debt service | 2,435,894 |

[1]Does not include $1 million of interest paid by Vista to Columbia Pictures in 1974.

BREAKOUT

| | 1975 | 1976 | 1977 | 1978 |
|---|---|---|---|---|
| **I. Gross receipts** | | | | |
| United States: | | | | |
| Theatrical | $5,892,613 | $815,000 | $88,367 | $21,526 |
| Non-theatrical and trailer | 150,560 | 295,711 | 68,798 | 55,755 |
| Network television | 0 | 0 | 1,275,000 | 225,000 |
| Pay television | 20,137 | 134,549 | 80,077 | 175 |
| Television syndication | 0 | 0 | 0 | 0 |
| | $6,063,310 | $1,245,260 | $1,512,242 | $302,456 |
| Foreign | 4,543,684 | 1,586,889 | 718,726 | 384,447 |
| Video cassette | 0 | 0 | 0 | 0 |
| Video disc (RCA) | 0 | 0 | 0 | 0 |
| Total gross receipts | 10,606,994 | 2,832,149 | 2,230,968 | 686,903 |
| **II. Expenses before debt service** | | | | |
| Distribution fees | 3,358,568 | 874,823 | 707,578 | 192,513 |
| Releasing costs | 3,124,045 | 559,034 | 895,101 | 290,168 |
| Motion Picture Association dues and taxes | 269,995 | 87,501 | 26,388 | 19,407 |
| Third-party deferments | 0 | 25,000 | 25,000 | 0 |
| Total | 6,752,608 | 1,546,791 | 1,654,067 | 502,088 |
| Distributable gross receipts | 3,854,386 | 1,285,791 | 576,901 | 184,815 |
| **III. Promissory note payments** | | | | |
| Principal | 2,730,462 | 785,200 | 222,813 | 0 |
| Interest | 160,327 | 179,143 | 209,863 | 138,611 |
| | 2,890,789 | 964,343 | 432,676 | 138,611 |
| Net after debt service | 963,597 | 321,448 | 144,225 | 46,204 |

BREAKOUT

| | 1979 | | 1980 | | 1981 | | 1982 | |
|---|---:|---:|---:|---:|---:|---:|---:|---:|
| **I. Gross receipts** | | | | | | | | |
| United States: | | | | | | | | |
| Theatrical | $6,457 | | ($345) | | $4,520 | | ($2,122) | |
| Nontheatrical and trailer | 21,247 | | 24,088 | | 15,096 | | 4,432 | |
| Network television | 0 | | 0 | | 0 | | 0 | |
| Pay television | 1 | | 91,869 | | 921 | | 0 | |
| Television syndication | 0 | $27,705 | 16,296 | $131,908 | 120,663 | $141,200 | 209,973 | $212,283 |
| Foreign | | 249,677 | | 279,199 | | 396,368 | | 150,534 |
| Video cassette | | 0 | | 254,288 | | 62,913 | | 32,803 |
| Video disc (RCA) | | 0 | | 0 | | 0 | | 0 |
| Total gross receipts | | 277,382 | | 665,395 | | 600,481 | | 425,620 |
| **II. Expenses before debt service** | | | | | | | | |
| Distribution fees | | 89,409 | | 218,793 | | 188,457 | | 128,703 |
| Releasing costs | | 106,265 | | 259,091 | | 228,143 | | 169,111 |
| Motion Picture Association dues and taxes | | 11,386 | | 18,206 | | 34,549 | | 13,725 |
| Third-party deferments | | 0 | | 0 | | 0 | | 0 |
| Total | | 207,060 | | 496,090 | | 451,149 | | 311,539 |
| Distributable gross receipts | | 70,322 | | 169,305 | | 149,332 | | 114,081 |
| **III. Promissory note payments** | | | | | | | | |
| Principal | 0 | | 0 | | 0 | | 0 | |
| Interest | 52,742 | 52,742 | 126,575 | 126,575 | 111,999 | 111,999 | 85,561 | 85,561 |
| Net after debt service | | 17,580 | | 42,730 | | 37,333 | | 28,520 |

## BREAKOUT

|  | 1983 | | 1984 | |
|---|---:|---:|---:|---:|
| **I. Gross receipts** | | | | |
| United States: | | | | |
| Theatrical | $150 | | $442 | |
| Non-theatrical and trailer | 8,475 | | 1,759 | |
| Network television | 0 | | 0 | |
| Pay television | 0 | | 0 | |
| Television syndication | 209,009 | $217,634 | 174,641 | $176,842 |
| Foreign | | 82,119 | | 38,624 |
| Video cassette | | 5,494 | | 14,093 |
| Video disc (RCA) | | 200,565 | | 114,069 |
| Total gross receipts | | 505,812 | | 343,628 |
| **II. Expenses before debt service** | | | | |
| Distribution fees | | 163,549 | | 2,512 |
| Releasing costs | | 164,257 | | 192,377 |
| Motion Picture Association dues and taxes | | 66,767 | | 14,987 |
| Third-party deferments | | 0 | | 0 |
| Total | | 394,573 | | 209,876 |
| Distributable gross receipts | | 111,239 | | 133,752 |
| **III. Promissory note payments** | | | | |
| Principal | 0 | | 0 | |
| Interest | 83,430 | 83,430 | 100,314 | 100,314 |
| Net after debt service | | 27,809 | | 33,438 |

## BREAKOUT

| | Cumulative (1975-1984) |
|---|---|
| **I. Gross receipts** | |
| United States: | |
| Theatrical | $6,826,608 |
| Nontheatrical and trailer | 645,921 |
| Network television | 1,500,000 |
| Pay television | 327,729 |
| Television syndication | 730,582 |
| | $10,030,840 |
| Foreign | 8,430,267 |
| Video cassette | 369,591 |
| Video disc (RCA) | 344,634 |
| Total gross receipts | 19,175,332 |
| **II. Expenses before debt service** | |
| Distribution fees | 5,924,905 |
| Releasing costs | 5,987,592 |
| Motion Picture Association dues and taxes | 562,911 |
| Third-party deferments | 50,000 |
| Total | 12,525,408 |
| Distributable gross receipts | 6,649,924 |
| **III. Promissory note payments** | |
| Principal | 3,738,475 |
| Interest | [1]1,248,565 |
| Net after debt service | 4,987,040 |
| | 1,662,884 |

[1]Does not include $625,000 of interest paid by Vista to Columbia Pictures in 1974.

## SHAMPOO

| | 1975 | 1976 | 1977 | 1978 |
|---|---|---|---|---|
| **I. Gross receipts** | | | | |
| United States: | | | | |
| Theatrical | $16,244,373 | $5,090,517 | $557,402 | $120,934 |
| Nontheatrical and trailer | 37,097 | 63,479 | 77,295 | 29,727 |
| Network television | 0 | 0 | 0 | 0 |
| Pay television | 31,279 | 76,406 | 402,856 | 61,640 |
| Television syndication | 0 | 0 | 0 | 0 |
| | $16,312,749 | $5,230,402 | $1,037,553 | $212,301 |
| Foreign | 2,252,337 | 2,854,374 | 1,327,913 | 251,113 |
| Total gross receipts | 18,565,086 | 8,084,776 | 2,365,466 | 463,414 |
| **II. Expenses before debt service** | | | | |
| Distribution fees | 6,048,891 | 2,787,495 | 769,489 | 151,003 |
| Releasing costs | 3,827,985 | 1,078,264 | 676,650 | 141,304 |
| Motion Picture Association dues and taxes | 300,464 | 110,460 | 149,545 | 22,415 |
| Third-party gross participations | 1,551,900 | 793,984 | 375,663 | 72,253 |
| Third-party net participations | 689,000 | 1,048,126 | 315,964 | 62,241 |
| Total | 12,418,240 | 5,818,329 | 2,287,311 | 449,216 |
| Distributable gross receipts | 6,146,846 | 2,266,447 | 78,155 | 14,198 |
| **III. Promissory note payments** | | | | |
| Principal | 4,691,839 | 708,161 | 0 | 0 |
| Interest | (81,704) | 81,704 | 0 | 0 |
| | 4,610,135 | 789,865 | 0 | 0 |
| Net after debt service | 1,536,711 | 1,476,582 | 78,155 | 14,198 |

## SHAMPOO

| | 1979 | 1980 | 1981 | 1982 |
|---|---|---|---|---|
| **I.** *Gross receipts* | | | | |
| United States: | | | | |
| Theatrical | $101,705 | ($17,899) | $11,137 | $8,791 |
| Nontheatrical and trailer | 27,184 | 44,086 | 5,157 | 17,071 |
| Network television | 1,787,500 | 0 | 0 | 687,500 |
| Pay television | 46,789 | 754 | 5,777 | 0 |
| Television syndication | 0 | 0 | 0 | 0 |
| | $1,963,178 | $26,941 | $22,071 | $713,362 |
| Foreign | 224,564 | 222,388 | 392,833 | 187,651 |
| Total gross receipts | 2,187,742 | 249,329 | 414,904 | 901,013 |
| **II.** *Expenses before debt service* | | | | |
| Distribution fees | 710,015 | 76,049 | 125,833 | 286,841 |
| Releasing costs | 688,624 | 74,653 | 130,477 | 280,408 |
| Motion Picture Association | | | | |
| dues and taxes | 8,716 | 18,335 | 14,188 | 15,337 |
| Third-party gross participations | 382,379 | 35,441 | 65,314 | 144,147 |
| Third-party net participations | 374,546 | 25,725 | 55,317 | 141,223 |
| Total | 2,164,280 | 230,203 | 391,129 | 867,956 |
| Distributable gross receipts | 23,462 | 19,126 | 23,775 | 33,057 |
| **III.** *Promissory note payments* | | | | |
| Principal | 0 | 0 | 0 | 0 |
| Interest | 0 | 0 | 0 | 0 |
| Net after debt service | 23,462 | 19,126 | 23,775 | 33,057 |

## SHAMPOO

| | 1983 | 1984 |
|---|---:|---:|
| I. *Gross receipts* | | |
| United States: | | |
| Theatrical | $1,534 | $376 |
| Nontheatrical and trailer | 983 | 1,502 |
| Network television | 275,000 | 0 |
| Pay television | 2,884 | 0 |
| Television syndication | 635,062 | 218,640 |
| | $915,463 | $220,518 |
| Foreign | 101,835 | 123,430 |
| Total gross receipts | 1,017,298 | 343,948 |
| II. *Expenses before debt service* | | |
| Distribution fees | 328,241 | 97,947 |
| Releasing costs | 298,393 | 111,994 |
| Motion Picture Association dues and taxes | 42,466 | 41,759 |
| Third-party gross participations | 156,586 | 19,098 |
| Third-party net participations | 146,146 | 19,098 |
| Total | 971,832 | 289,896 |
| Distributable gross receipts | 45,466 | 54,052 |
| III. *Promissory note payments* | | |
| Principal | 0 | 0 |
| Interest | 0 | 0 |
| Net after debt service | 45,466 | 54,052 |

## SHAMPOO

| | Cumulative (1975-1984) | |
|---|---:|---:|
| **I. Gross receipts** | | |
| United States: | | |
| Theatrical | | $22,118,870 |
| Non-theatrical and trailer | | 303,581 |
| Network television | | 2,750,000 |
| Pay television | | 628,385 |
| Television syndication | | 853,702 |
| | | $26,654,538 |
| Foreign | | 7,938,438 |
| Total gross receipts | | 34,592,976 |
| **II. Expenses before debt service** | | |
| Distribution fees | | 11,381,804 |
| Releasing costs | | 7,308,752 |
| Motion Picture Association dues and taxes | | 723,685 |
| Third-party gross participations | | 3,596,765 |
| Third-party net participations | | 2,877,386 |
| Total | | 25,888,392 |
| Distributable gross receipts | | 8,704,584 |
| **III. Promissory note payments** | | |
| Principal | 5,400,000 | |
| Interest | 0 [1] | 5,400,000 |
| Net after debt service | | 3,304,584 |

[1] Does not include $600,000 of interest paid by Vista to Columbia Pictures in 1974.

## BITE THE BULLET

| | 1975 | 1976 | 1977 | 1978 |
|---|---:|---:|---:|---:|
| **I. Gross receipts** | | | | |
| United States: | | | | |
| Theatrical | $2,130,904 | $2,530,124 | $136,172 | $39,088 |
| Nontheatrical and trailer | 5,768 | 393,250 | 172,492 | 19,429 |
| Network television | 0 | 0 | 0 | 877,500 |
| Pay television | 0 | 10,406 | 249,590 | 17,195 |
| | $2,136,672 | $2,933,780 | $558,254 | $953,212 |
| Foreign | 358,244 | 2,367,500 | 632,678 | 349,118 |
| Video cassette | 0 | 0 | 0 | 0 |
| Total gross receipts | 2,494,916 | 5,301,280 | 1,190,932 | 1,302,330 |
| **II. Expenses before debt service** | | | | |
| Distribution fees | 792,123 | 1,686,116 | 355,260 | 411,741 |
| Releasing costs | 659,288 | 1,388,562 | 488,963 | 555,577 |
| Motion Picture Association dues and taxes | 57,615 | 92,489 | 41,740 | 20,307 |
| Total | 1,509,026 | 3,167,167 | 885,963 | 987,625 |
| Distributable gross receipts | 985,890 | 2,134,113 | 304,969 | 314,705 |
| **III. Promissory note payments** | | | | |
| Principal | 432,249 | 1,332,863 | 0 | 0 |
| Interest | 307,167 | 267,722 | 228,727 | 236,029 |
| | 739,416 | 1,600,585 | 228,727 | 236,029 |
| Net after debt service | 246,474 | 533,528 | 76,242 | 78,676 |

## BITE THE BULLET

| | 1979 | | 1980 | | 1981 | | 1982 | |
|---|---:|---:|---:|---:|---:|---:|---:|---:|
| **I. Gross receipts** | | | | | | | | |
| United States: | | | | | | | | |
| Theatrical | $17,623 | | $3,214 | | $3,879 | | ($418) | |
| Nontheatrical and trailer | 31,379 | | 5,254 | | 3,497 | | 2,914 | |
| Network television | 0 | | 337,500 | | 135,000 | | 0 | |
| Pay television | 514 | | 271 | | 40,000 | | 20,584 | |
| | | $49,516 | | $346,239 | | $182,376 | | $23,080 |
| Foreign | | 316,554 | | 271,062 | | 295,406 | | 66,025 |
| Video cassette | | 0 | | 0 | | 0 | | 0 |
| Total gross receipts | | 366,070 | | 617,301 | | 477,782 | | 89,105 |
| **II. Expenses before debt service** | | | | | | | | |
| Distribution fees | 112,161 | | 192,575 | | 145,736 | | 26,021 | |
| Releasing costs | 156,731 | | 252,796 | | 189,974 | | 34,730 | |
| Motion Picture Association dues and taxes | 7,545 | | 22,127 | | 24,597 | | 6,527 | |
| Total | | 276,437 | | 467,498 | | 360,307 | | 67,278 |
| Distributable gross receipts | | 89,633 | | 149,803 | | 117,475 | | 21,828 |
| **III. Promissory note payments** | | | | | | | | |
| Principal | 0 | | 0 | | 0 | | 0 | |
| Interest | 67,225 | | 112,353 | | 88,106 | | 16,370 | |
| Net after debt service | | 22,408 | | 37,450 | | 29,369 | | 5,458 |

## BITE THE BULLET

| | 1983 | 1984 |
|---|---|---|
| I. *Gross receipts* | | |
| United States: | | |
| Theatrical | $225 | ($131) |
| Nontheatrical and trailer | 2,067 | 5,504 |
| Network television | 0 | 0 |
| Pay television | 46,273 | 436 |
| | $48,565 | $5,809 |
| Foreign | 31,225 | 91,961 |
| Video cassette | 0 | 106,863 |
| Total gross receipts | 79,790 | 204,633 |
| II. *Expenses before debt service* | | |
| Distribution fees | 20,759 | 33,464 |
| Releasing costs | 25,118 | 89,424 |
| Motion Picture Association dues and taxes | 18,592 | 24,694 |
| Total | 64,469 | 147,582 |
| Distributable gross receipts | 15,321 | 57,051 |
| III. *Promissory note payments* | | |
| Principal | 0 | 0 |
| Interest | 11,378 | 42,788 |
| Net after debt service | 3,943 | 14,263 |

## BITE THE BULLET

|  | Cumulative (1975-1984) |
|---|---|
| I. *Gross receipts* | |
| United States: | |
| Theatrical | $4,860,680 |
| Nontheatrical and trailer | 641,554 |
| Network television | 1,350,000 |
| Pay television | 385,269 |
|  | $7,237,503 |
| Foreign | 4,779,773 |
| Video cassette | 106,863 |
| Total gross receipts | 12,124,139 |
| II. *Expenses before debt service* | |
| Distribution fees | 3,775,956 |
| Releasing costs | 3,841,163 |
| Motion Picture Association dues and taxes | 316,233 |
| Total | 7,933,352 |
| Distributable gross receipts | 4,190,787 |
| III. *Promissory note payments* | |
| Principal | 1,765,112 |
| Interest | [1]1,377,865 |
| Net after debt service | 1,047,810 |

[1]Does not include $600,000 of interest paid by Vista to Columbia Pictures in 1974.

| Year | Income | Payments to partners | Interest | Depreciation | Other expenses[1] | Income/(loss) |
|---|---|---|---|---|---|---|
| 1974 | 0 | $582,936 | $2,825,000 | 0 | $44,931 | ($3,452,867) |
| 1975 | $48,991,604 | 652,350 | 660,441 | $17,048,000 | 32,550,398 | (1,919,585) |
| 1976 | 21,331,867 | 0 | 702,451 | 6,386,506 | [2]12,592,911 | 1,649,999 |
| 1977 | 6,765,501 | 0 | 626,602 | 1,274,528 | 5,590,125 | (725,754) |
| 1978 | 2,783,230 | 0 | 416,282 | 670,675 | 2,230,567 | (534,294) |
| 1979 | 2,994,422 | 0 | 135,063 | 552,838 | 2,792,575 | (486,054) |
| 1980 | 2,602,442 | 0 | 294,302 | 856,716 | 2,185,025 | (733,601) |
| 1981 | 3,218,053 | 0 | 211,522 | 907,213 | 2,923,015 | (823,697) |
| 1982 | 2,095,381 | 0 | 137,041 | 445,428 | 1,872,555 | (359,643) |
| 1983 | 1,741,764 | 0 | 105,373 | 229,530 | 1,576,652 | (169,791) |
| 1984 | 1,210,013 | 0 | 143,102 | 256,911 | 998,412 | (188,412) |
| Total | 93,734,277 | 1,235,286 | 6,257,179 | 28,628,345 | 65,357,166 | (7,743,699) |

[1]Includes distribution fees, Motion Picture Association dues and taxes, releasing costs, third-party participations, and administration expenses.

[2]There is an inconsistency in the stipulated facts in that it would appear that this expense figure of $12,592,911 should have been $12,611,770 but for some unknown reason the difference of $18,859 was allocated by stipulation to the fifth film not in issue. We shall accept the latter allocation of the parties.

receipts by subtracting from gross receipts estimated distribution fees, releasing costs, motion picture association dues, and taxes. Vista did not include third-party participations in its calculations. In each subsequent year, Vista determined that there were circumstances which required that the estimates be revised, and adjusted these estimates accordingly.

In 1974, petitioners made capital contributions to Vista in the following amounts:

| Petitioner | Amounts |
| --- | --- |
| Guy B. Bailey, Jr | $53,333.33 |
| Henry Milgram | 80,000.00 |
| William Milgram | 80,000.00 |
| Norman B. Levy | 40,000.00 |

During the years in issue, petitioners held interests in the profits, losses, and investment tax credits of Vista as follows:

| Petitioner | Years | Interest |
| --- | --- | --- |
| Guy B. Bailey, Jr. | 1974-76 | 0.6533% |
| Henry Milgram | 1974-79 | 0.98 |
| William Milgram | 1974-80 | 0.98 |
| Norman B. Levy | 1974-78 | 0.49 |

During the years in issue, the limited partners of Vista held in aggregate a 95.06-percent interest in the profits, losses, and investment tax credits in Vista.

For the years 1974 through 1984, Vista made cash distributions to its partners as follows:

| Year | Amount distributed |
| --- | --- |
| 1974 | 0 |
| 1975 | $3,844,999 |
| 1976 | 2,825,001 |
| 1977 | 380,000 |
| 1978 | 162,000 |
| 1979 | 73,000 |
| 1980 | 58,001 |
| 1981 | 140,000 |
| 1982 | 150,000 |
| 1983 | 140,000 |
| 1984 | 40,000 |
| Total | 7,813,001 |

On their Federal income tax returns, petitioners reported the following amounts as their distributive shares of the income or loss from Vista (for all five films):

| Partner | Year | Income (loss) |
|---|---|---|
| Guy B. Bailey, Jr. | 1974 | ($36,684) |
| | 1975 | (13,430) |
| | 1976 | 17,448 |
| Henry Milgram | 1974 | (55,053) |
| | 1975 | (20,147) |
| | 1976 | 26,175 |
| | 1977 | (1,608) |
| | 1978 | (4,920) |
| | 1979 | (4,630) |
| William Milgram | 1974 | (55,053) |
| | 1975 | (20,146) |
| | 1976 | 26,175 |
| | 1977 | (1,608) |
| | 1978 | (4,920) |
| | 1979 | (4,625) |
| | 1980 | (7,173) |
| Norman B. Levy | 1974 | (27,527) |
| | 1975 | (10,073) |
| | 1976 | 13,088 |

On their 1975 Federal income tax returns, petitioners claimed the following amounts of investment tax credit with respect to property placed in service by Vista:

| Partner | Amount |
|---|---|
| Guy B. Bailey, Jr | $12,280 |
| Henry Milgram | 19,894 |
| William Milgram | 19,894 |
| Norman B. Levy | 9,947 |

The 7-percent investment-tax credit was based on each partner's distributive share of Vista's $29 million purchase price for the four films.

Each Vista film constitutes a qualified film within the meaning of section 48(k)(1)(B). Each of the films constituted new section 38 property (determined without regard to useful life) as to Vista within the meaning of section 48(k)(1)(A)(i) when Vista placed the films in service in 1975.

## OPINION

These consolidated cases involve a number of issues arising from petitioner-husbands' interests as limited partners in Persky-Bright and Vista, two partnerships of which Lester Persky and Richard S. Bright are directly or

indirectly the general partners. It is anticipated that the Court's opinion will provide guidance as to how to resolve the issues in various other partnerships in which Persky and Bright are directly or indirectly general partners.

Respondent's determinations set forth various grounds for disallowing the deductions and investment tax credits claimed by petitioner-husbands as limited partners in Persky-Bright and Vista.

The initial issue for determination is whether Persky-Bright and Vista became the owners of the relevant motion pictures. As we have found, and as petitioners have conceded, the transactions under review were between Columbia and the partnerships, and we see no need for any further reference to the nominal ownership by the other entities.

Petitioners' initial contention is that the purchase of the motion pictures by the partnerships should be recognized for Federal tax purposes. They argue that the partnerships' purchases of the motion pictures were motivated by a business purpose and supported by economic substance, and that the partnerships acquired the benefits and burdens of ownership and an equity interest in the motion pictures.

Respondent's initial contention is that the partnerships' ownership of the motion pictures should be disregarded for Federal income tax purposes. Respondent argues that Columbia retained possession and control of the films through the distribution agreements, that the partnerships never acquired an equity interest in the films, and that the partnerships never acquired the burden and benefits of ownership of the films.

At the Court's direction, each of the parties filed supplemental briefs with respect to the applicability to these cases of the opinions in *Durkin v. Commissioner,* 87 T.C. 1329 (1986), *Tolwinsky v. Commissioner,* 86 T.C. 1009 (1986), and *Law v. Commissioner,* 86 T.C. 1065 (1986).

Whether the partnerships became the owners of the motion pictures for tax purposes as a result of the transactions involved herein are questions of fact to be determined by reference to the written agreements read in light of the attending facts and circumstances. *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221, 1237

(1981); *Miller v. Commissioner,* 68 T.C. 767, 776 (1977); see *Fields v. Commissioner,* 14 T.C. 1202, 1210-1213 (1950), affd. 189 F.2d 950 (2d Cir. 1951). It is well established that the economic substance of a transaction rather than the form in which it is cast is determinative of its tax consequences. See *Golsen v. Commissioner,* 54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971), and the cases cited therein.

For purposes of Federal income taxation, a sale occurs upon the transfer of the benefits and burdens of ownership rather than upon the satisfaction of the technical requirements for the passage of title under State law. *Grodt & McKay Realty, Inc. v. Commissioner, supra.* In a number of cases, this Court and other courts have refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of the property where the transferor continues to retain significant control over the property transferred. E.g., *Helvering v. Clifford,* 309 U.S. 331 (1940); *Helvering v. F&R Lazarus Co.,* 308 U.S. 252 (1939); *Durkin v. Commissioner,* 87 T.C. 1329 (1986); *Tolwinsky v. Commissioner,* 86 T.C. 1009 (1986); *Hilton v. Commissioner,* 74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir. 1982). "Taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." *Corliss v. Bowers,* 281 U.S. 376, 378 (1930). It is therefore fundamental that the availability of a depreciation deduction is not predicated on the mere holding of legal title to property but rather upon a capital investment in the property. *Gladding Dry Goods Co. v. Commissioner,* 2 B.T.A. 336 (1925).

For tax purposes, a sale of a motion picture occurs when there is a transfer of all substantial rights of value in the motion picture copyright. *Tolwinsky v. Commissioner,* 86 T.C. at 1042-1043. No sale occurs if the transferor retains substantial proprietary rights in the motion picture. *Durkin v. Commissioner,* 87 T.C. at 1369; see *Carnegie Productions, Inc. v. Commissioner,* 59 T.C. 642, 653 (1973); *Cory v. Commissioner,* 23 T.C. 775 (1955), affd. 230 F.2d 941 (2d Cir. 1956).

After a thorough review of the record, we find that Persky-Bright and Vista did not acquire depreciable interests in the motion pictures but, in substance, purchased intangible contractual rights to payments contingent upon the success of Columbia's exploitation of the motion pictures. *Durkin v. Commissioner, supra; Tolwinsky v. Commissioner, supra; Law v. Commissioner, supra.* The fact that the Persky-Bright and Vista purchase agreements used the language of a sale and purported to convey ownership is not determinative of whether each of the partnerships actually became the owner for purposes of depreciation. *Helvering v. F&R Lazarus Co., supra; Green v. Commissioner,* 83 T.C. 667 (1984).

An examination of the various written agreements and surrounding circumstances in these cases reveals that the partnerships acquired no substantial ownership rights in the motion pictures. We believe the instant cases are controlled by *Durkin v. Commissioner,* 87 T.C. 1329 (1987), and *Tolwinsky v. Commissioner,* 86 T.C. 1009 (1986). As in those cases, the purchase agreements provide that the partnerships were acquiring legal title to the negative and the copyright of each film. Similarly, the distribution agreements grant back to Columbia the exclusive right to distribute and otherwise deal with the motion pictures throughout the world in all media under the terms of those agreements. Columbia also was given a security interest in each film's negative and copyright, which was filed with the proper recording office. Between the distribution agreement and its security interests, Columbia regained virtually every right it ostensibly transferred to the partnerships under the purchase agreements. Since we have integrated purchase and distribution agreements, it may be more realistic to say that Columbia retained all those rights.

Under the distribution agreements and related documents, Columbia had the right to obtain copies of the motion pictures, to sell or lease copies of the motion pictures, to show the motion pictures to the public, to promote and advertise the motion pictures, and, for the Vista films, to sell or license trailers, souvenir programs, and booklets. Columbia also had merchandising, publication, and soundtrack record album rights and other subsidiary rights.

Columbia's distribution rights extended to other media including pay television, video cassettes, video discs, and commercial television. Columbia had the right to distribute the motion pictures through subdistributors or to make an outright sale or license of the theatrical distribution rights for a flat sum to a third party.[13] Such enumerated rights meant that Columbia had the entire bundle of rights that is a copyright. See *Durkin v. Commissioner*, 87 T.C. at 1369.

Our conclusion that Columbia did not convey all substantial rights in the motion pictures and their copyrights is further supported by the fact that Columbia retained rights and liabilities commonly associated with ownership. Columbia had the right to determine the overall sales and advertising policy in connection with the distribution of the motion pictures. Columbia's name was to appear on all the motion pictures and related advertising. Lastly, there is no credible evidence that the partnerships had any control over exploitation of the motion pictures. See *Durkin v. Commissioner*, 87 T.C. at 1369-1370.

Petitioners' claim that the partnerships through Persky were involved in the distribution strategy of the films is based on the self-serving testimony of Persky. We are satisfied that Persky was in frequent contact with Columbia's distribution staff, on behalf of the partnerships, to keep track of the distribution results as they impacted on the partnerships. We also are satisfied that Persky was not involved in any substantial way in Columbia's distribution strategy for these films or in any other matters involving Columbia's exploitation of these films.

Petitioners contend that they are the true owners of the motion pictures because they had the right under the distribution agreements to approve Columbia's sales and advertising policy in connection with the distribution of the films. Although the agreements gave the partnerships the right to approve Columbia's sales and advertising policy, the agreements also provided that such approval shall not be unreasonably withheld. Marcus, who negotiated the agreements for Columbia, explained that this provision only

---

[13]The ostensible proviso there was a 7-day waiting period for the partnerships to take action to find third parties other than those selected by Columbia is, in our view, mere window dressing.

required Columbia to consult with the partnerships and that Columbia had the final say consistent with the normal practice of a major motion picture distributor. It is clear that Columbia ran its distribution program and any related advertising program. When Persky attempted to tell the Columbia distribution and marketing people what to do, they complained to Marcus about these disruptions to their operations. Marcus pressed Persky to promise not to contact such persons directly but to get any information Persky wanted from Marcus or through his office. Although we found that Warren Beatty and Persky prepared a series of ads for "Shampoo, this does not mean that Columbia relinquished control over its advertising policy, even for that motion picture.

Petitioners assert that Columbia was not permitted to sue for copyright infringement in its own name since the partnerships had the films registered with the copyright office. This statement appears incorrect with respect to Columbia's rights at least for all the Vista films. The definition of gross receipts in the Vista distribution agreements contained in Exhibit A includes the net moneys received by Columbia from "recovery by Columbia for infringement of copyright of the Picture." Implicit in these provisions is legal action by Columbia to recover for infringement of the copyright of films owned by Columbia. This is yet another factor previously referred to as showing a lack of ownership by the purported purchasers. *Durkin v. Commissioner, supra.* The definition of gross receipts in the Persky-Bright distribution agreement merely incorporates the definition in Columbia's standard distribution agreement. Since the parties failed to include a copy of Columbia's standard distribution agreement in this voluminous record, we are unable to address this point as to the Persky-Bright film.

Although Columbia purported to convey ownership of the motion pictures and the copyrights thereto to the partnerships, Columbia retained complete and exclusive control over the motion pictures, effectively in perpetuity, through the distribution agreements. It was clear from this record that the anticipated economic useful life of a film released during the 1973 through 1975 period was approximately 10

years. Under the distribution agreements, the partnerships granted Columbia the exclusive license to distribute and deal with the motion pictures throughout the world in all media for a term of 10 years.

As a practical matter, the rights granted to Columbia pursuant to the distribution agreements were perpetual. The agreements expressly provided that Columbia has the right to extend the term and acquire the rights to distribute the motion pictures in perpetuity by paying the greater of the so-called fair market value of the extended distribution rights at the time the distribution rights were extended, or an amount of $25,000 ($15,000 for "Summer Wishes Winter Dreams" and "$40,000 for "Funny Lady"). That both Columbia and the partnerships intended to extend the distribution agreements in perpetuity is evident from the fact that the distribution agreements provide that fair market value for such extensions was to be based on the average price paid by Columbia to extend the term of the agreements relating to the distribution of comparable pictures pursuant to which Columbia had acquired the distribution rights for a 10-year term and had exercised a right to extend the term in perpetuity. In short, all the parties agreed that Columbia would have the perpetual rights to distribution by payment of a modest sum or based on interrelated prices for comparable films which Columbia intended to keep under its control. Each of the Vista distribution agreements provided that the extension payments were to be deemed an advance by Columbia to the partnership and were to be recouped by Columbia out of Vista's share of the distributable gross receipts from the relevant film. A similar provision is contained in the Persky-Bright distribution agreement. Thus, the price for extension of a distribution agreement was an acceleration in the payment of distributable gross receipts otherwise to be paid to a partnership. Keeping in mind the fact that a major distributor was needed to engender distributable gross profits, we find that Columbia's rights under the distribution agreements were to be held in perpetuity.

Our conclusion that Columbia retained all substantial rights to the motion pictures is further supported by the fact that Columbia retained a significant financial stake in

each motion picture and a significant financial interest in each motion picture and its proceeds. *Tolwinsky v. Commissioner, supra; Durkin v. Commissioner, supra.* After receiving Persky-Bright's cash payments of $375,000 (including the amounts denominated as "prepaid interest"), Columbia remained at financial risk for $1,418,972 of the production costs for "Summer Wishes, Winter Dreams." After receiving Vista's cash payments of $5,650,000 (including the amounts denominated as "prepaid interest"), Columbia remained at financial risk for $18,833,180 of the production costs for the four films. For each of these films, Columbia's financial risks were significant and far outweighed those assumed by the partnerships. Columbia also held Persky-Bright's nonrecourse note of $1,850,000 and Vista's nonrecourse notes totaling $26,175,000. These notes were a measure of the funds from the films which could flow to Columbia aside from the distribution fees. Although there was a deferment of some releasing cost payments, there was no limit placed on the amount of profit Columbia could receive from its distribution efforts. Columbia would not have sold the motion pictures if it could not distribute them. Columbia's financial interests combined with its exploitation of the films clearly indicate it had all the rights and responsibilities of ownership.

We disagree with petitioners' assertions that the partnerships were entitled to 100 percent of the distributable gross receipts from the films, subject to payment of the nonrecourse notes. Aside from the specified minimum gross receipts provisions, the essence of the agreements is that the partnerships are entitled to 25 percent of the distributable gross receipts from a particular film until the nonrecourse note pertaining to that film is paid from the other 75 percent. If a note is paid, then the partnership is entitled to 100 percent of the distributable gross receipts of the film. In *Durkin v. Commissioner, supra,* one of the financial interests retained by the distributor was a substantial interest in the net proceeds after payment of the notes. See *Vandenhoff v. Commissioner,* T.C. Memo. 1987-116. From this, petitioners argue that the partnerships, which owned the negatives and copyrights, were owners of the motion pictures since they were entitled to

100 percent of the "net profits" if the notes were paid. This argument fails to consider the other ownership rights and financial interests retained by Columbia. In *Tolwinsky v. Commissioner, supra,* the partnerships likewise were entitled to 100 percent of the "net profits" if the notes were paid under comparable terms. The Court there characterized this right as an income interest "akin to, but not in fact a 'participation' in the profits of the motion picture's exploitation." *Tolwinsky v Commissioner,* 86 T.C. at 1050. The Court also explained in that case that those payments would be made if the motion picture was wildly successful and that it was unlikely that the notes would be satisfied. In the instant cases, the partnerships likewise would receive 100 percent of the distributable gross receipts only if a film was wildly successful. At the time the agreements were executed, it was unlikely that the notes would be paid during the anticipated useful life of 10 years. During the 10-year periods of the five notes held by the two partnerships, only the "Shampoo" note was satisfied and that was because "Shampoo" far exceeded the expectations of Columbia and Persky and was wildly successful. As in *Durkin v. Commissioner, supra,* and *Tolwinsky v. Commissioner, supra,* the partnerships here received an income interest in the exploitation of the motion pictures.

Moreover, our examination of the entire record leads us to conclude that Columbia merely sought to raise risk capital to offset approximately 20 percent of the production costs of its films. The total production cost of "Summer Wishes, Winter Dreams" was $1,939,822. Columbia raised risk capital in the amount of $375,000 through Persky-Bright. Consequently, Columbia offset more than 19 percent of the production cost. We do not believe that Columbia would relinquish ownership of that film for the guaranteed sum of $375,000 where production costs exceeded $1,900,000 and additional payment remained contingent and speculative. The total production costs of the four Vista films was $27,569,374. Columbia raised risk capital in the amount of $5,650,000 through Vista. Consequently, Columbia offset approximately 20 percent of the production costs of those films. Again, we do not believe Columbia would relinquish ownership of those films for the guaranteed sum of

$5,650,000 where production costs exceeded $27,500,000 and additional payments remained contingent and speculative.[14] We are convinced that Columbia would not sell any of the films without retention of the substantial proprietary rights indicative of ownership.

The only interests acquired by the partnerships were a contingent participation in the distributable gross receipts of Columbia's distribution efforts for each film. The cash investments by the partnerships reduced Columbia's financial risk in the films, but such payments, without more, do not give the partnerships depreciable interests in the film. *Law v. Commissioner,* 86 T.C. at 1097; See *Vandenhoff v. Commissioner,* T.C. Memo. 1987-116. Because we have determined that Columbia was the actual owner of the films for Federal tax purposes, the partnerships obviously are not entitled to claim depreciation on the films. The partnerships are entitled to depreciate the intangible contractual rights to participate in the distributable gross receipts generated by the exploitation efforts of Columbia. *Durkin v. Commissioner,* 87 T.C. at 1372-1373; *Tolwinsky v. Commissioner,* 86 T.C. at 1052-1053; *Law v. Commissioner,* 86 T.C. at 1098.

The next issue for decision is whether the partnerships were activities not engaged in for profit so as to be subject to the limitations of section 183.[15] Whether an activity is engaged in for profit turns on whether the taxpayer has a bona fide objective of making a profit. *Dreicer v. Commissioner,* 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); *Jasionowski v. Commissioner,* 66 T.C. 312, 321 (1976). In determining whether the partnerships engaged in an activity for profit, "all the facts and circumstances with respect to the activity are to be taken into account." Sec. 1.183-2(b), Income Tax Regs.;

---

[14]Each of the Vista films were separately negotiated, although Burton Marcus referred to them as a package of films. We are also aware of the fact that the Vista films were not cross-collateralized. The fact that the partnership's interests in any one film could not depend on the success of any other film means that for each film, additional payments over the guaranteed sum were contingent and speculative.

[15]Sec. 183(a) provides that "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Sec. 183(b)(2) provides that deductions which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable years exceeds the deduction allowable by reason of paragraph (1)." Sec. 183(c) defines "an activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

*Jasionowski v. Commissioner, supra; Bessenyey v. Commissioner,* 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967).

In view of the factors set forth in *Tolwinsky v. Commissioner,* 86 T.C. at 1062-1063, we find that Persky-Bright and Vista engaged in their motion picture activities with intent to make a profit. All five films at issue were of high quality and were made by people who were well known to the general public and respected in the film community. There was no doubt, at least with respect to the Vista films, that the investors knew at the time the purchase and distribution agreements were executed that the films would generate substantial amounts of gross receipts and that a portion of those receipts might ultimately be distributed to the limited partners. Finally, the parterships could be assured of a well-financed and professional distribution effort by Columbia which would maximize the partnerships' share of gross receipts.

We turn to the issues of whether the nonrecourse purchase money notes are includable in basis, whether the interest on those notes is deductible, and whether the basis for the partnerships' contract rights is limited to the cost outlay with respect to each film.

Petitioners argue that the purchase money notes were given for business reasons and should be included in the depreciable bases of their contract rights. However, when a transaction is so structured that payment by the taxpayer is not probable, either because of the length or the terms of the debt, the source of the payments, or any other arrangement which does not provide an economic incentive for the taxpayer to pay the debt, then such debt is not genuine indebtedness to be taken into account for purposes of determining a taxpayer's investment in property. See *Tolwinsky v. Commissioner,* 86 T.C. at 1048-1050. Such a debt does not reflect an actual investment in property and cannot be included in the taxpayer's depreciable basis. *Siegel v. Commissioner,* 78 T.C. 659, 684-691 (1982); *Brannen v. Commissioner,* 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984); *Estate of Franklin v. Commissioner,* 64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976).

Thus, when debt principal is payable solely out of exploitation proceeds, nonrecourse loans are contingent obligations and are not treated as true debt. *Durkin v. Commissioner,* 87 T.C. at 1376; *Estate of Baron v. Commissioner,* 83 T.C. 542, 550-553 (1984), affd. 798 F.2d 65 (2d Cir. 1986); *Fox v. Commissioner,* 80 T.C. 972, 1022-1023 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. without published opinion sub nom. *Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner,* 734 F.2d 5-7, 9 (3d Cir. 1984), affd. sub nom. *Barnard v. Commissioner,* 731 F.2d 230 (4th Cir. 1984); *Saviano v. Commissioner,* 80 T.C. 955 (1983), affd. 765 F.2d 643 (7th Cir. 1985). Under facts similar to the instant cases, this Court has concluded that such notes were without business purpose, were executed solely to gain tax benefits, and were to be disregarded for tax purposes. *Durkin v. Commissioner,* 87 T.C. at 1378. See *Goldstein v. Commissioner,* 364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965); see also *Knetsch v. United States,* 364 U.S. 361 (1960).

As noted in *Law,* the instant cases are distinguishable from cases where respondent did not challenge the purchaser's ownership of the property acquired. *Law v. Commissioner,* 86 T.C. at 1100 n. 22. See, e.g., *Fuchs v. Commissioner,* 83 T.C. 79 (1984); *Siegel v. Commissioner,* 78 T.C. 659 (1982); *Brannen v. Commissioner,* 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). The instant cases are unlike *Leahy v. Commissioner,* 87 T.C. 56 (1986), where the record indicated that the partnership in fact purchased a 25-percent joint-venture interest. *Leahy v. Commissioner, supra.* The instant cases also are distinguishable from *Taube v. Commissioner,* 88 T.C. 464 (1987), where the out-of-pocket production costs were paid by the partner's contributions, where the notes representing deferred production costs plus a profit were personally guaranteed to the seller by the assumption agreements signed by the limited partners, and where the seller would be paid the amount of the note even if the films never generated a single dollar of revenue.

Once we have looked through the form of the transactions in issue and have determined that the partnerships only had

an income interest in the exploitation receipts from the motion pictures, it necessarily follows that the purchase notes must be disregarded for tax purposes since the debts have no substance. Although the notes seem to be secured by the motion pictures, they are not secured since the motion pictures are owned by Columbia to whom the purported debts are owed. These notes are payable solely out of receipts from the distribution by Columbia of its own motion pictures. The nonrecourse nature of the debts and the provisions for retaining it were mere paper transactions lacking economic substance. *Knetsch v. United States,* 364 U.S. 361 (1960); *Durkin v. Commissioner, supra; Tolwinsky v. Commissioner, supra; Karme v. Commissioner;* 73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982).

These transactions were so structured that there was no economic incentive for the partnerships to pay off the purchase notes despite the unquestioned across-the-board high quality of the films. Neither Columbia nor the partnerships ever expected payments to be made on the notes except from the distributable gross receipts earned by the respective film. Since only one out of any six films could be expected to earn its own production costs, neither Columbia nor the partnerships expected, nor could they expect, that each of the films would earn its own production costs when they entered into these transactions. At those times in 1973 and 1974, respectively, the films had not been released to the public. It is undisputed that the motion picture business is a risky business, and that prior to release of any film, public acceptance is difficult to predict, with swings in mood from one month to the next. Prior to the release of the films, it was impossible to determine whether there would be sufficient distributable gross receipts to satisfy any one of the notes. Marcus testified that Columbia's production, advertising, and distribution people had monthly meetings at which there would be estimates on the gross of upcoming films. Yet Persky admitted that he did not ask Columbia for such projections nor did he seek independent appraisals. See *Estate of Baron v. Commissioner, supra.* We were not favored with any of Columbia's appraisals prior to release of the films, however optimistic they may have been. We find that the notes never had any

reality aside from their anticipated tax consequences which were to increase the depreciable basis of each film and to provide substantial interest deductions. *Law v. Commissioner,* 86 T.C. at 1100; see *Goldstein v. Commissioner,* 364 F.2d at 740. As we have indicated, once we have determined that the partnerships only had an income interest in the earnings from the films, whatever appearance of substance the notes may have had, disappeared.

Petitioners make much of the fact that under the 1973 and 1975 distribution agreements, the partnerships would be entitled to 100 percent of the net profits from the films, if receipts were sufficient to pay off the notes. In 1973 and 1975, the likelihood that the partnerships would receive 100 percent of the net profits was as unlikely as in *Tolwinsky v. Commissioner, supra,* and *Law v. Commissioner, supra,* where those partnerships likewise were entitled to 100 percent of net profits if the notes were paid. The partnerships never became entitled to 100 percent of distributable gross receipts for four of their five films during their 10-year useful lives. This is not a surprise, since the receipts of these four films in the first two years, during which the greatest revenues normally are generated, did not satisfy their respective notes. Due to fortuitous and unexpected circumstances, "Shampoo" was an exceptional success, and Vista became entitled to 100 percent of the distributable gross receipts of that film. It is not unusual to use a net profits interest when calculating a participant's interest in a film. The third-party participants have substantial net profits interests with respect to the instant films. The third-party participants are entitled to approximately 70 percent of any net profits from "Summer Wishes, Winter Dreams," to 57½ percent of any net profits from "Funny Lady," and to 41¾ percent of the net profits from "Breakout." Even the third-party participants in "Shampoo" and "Bite the Bullet" have what amounts to net profits interests since their shares of gross profits participations increase when "breakeven" is reached. "Breakeven" would occur when gross receipts equal total expenses, including production costs, unless otherwise defined as a larger amount of gross receipts. These examples show there are many ways to share in exploitation results.

Since we have determined that the partnerships only had an income interest in the distributable gross receipts of the films, the notes are disregarded for tax purposes because they are not bona fide debts. Accordingly, no interest deductions are allowable with respect to the notes. However, the amounts mischaracterized and deducted as prepaid interest are to be included in basis as additional payments of principal. *Tolwinsky v. Commissioner,* 86 T.C. at 1057; *Siegel v. Commissioner,* 78 T.C. at 686-687.

We find further that the basis for depreciation of each partnership's income interest is the cost outlay of a partnership with respect to a particular film, i.e., the downpayment, the so-called prepayment of interest, and the portion of the management fees the parties have stipulated should be added to basis for the film, which we interpret to mean an allocation to the partnership's income interest in the film. Thus, the basis for Persky-Bright's income interest in "Summer Wishes, Winter Dreams" is $327,000. The bases for Vista's income interests are as follows: the basis for "Funny Lady' is $2,092,646; the basis for "Breakout" is $1,342,646; the basis for "Shampoo" is $1,292,646; and the basis for "Bite the Bullet" is $1,292,646.

We next consider the extent to which the partnerships are entitled to depreciation based on the income-forecast method of depreciation. This method of depreciation ties the amount of depreciation deduction allowable for each year to the amount cf income produced for that period. *Siegel v. Commissioner,* 78 T.C. at 692. This method may be used with respect to the depreciation of contract rights to a film. *Durkin v. Commissioner, supra.*

The income-forecast method requires the application of a fraction, the numerator of which is the income from the motion picture for the taxable period, and the denominator of which is the estimated total income from the motion picture during its useful life. The cost of the motion picture is multiplied by such fraction to calculate the depreciation allowed for such taxable period. Rev. Rul. 60-358, 1960-2 C.B. 68, as amplified by Rev. Rul. 64-273, 1964-2 C.B. 62. The term "income" means the taxpayer's net, rather than gross, income. *Gordon v. Commissioner,* 766 F.2d 293 (7th Cir. 1985), affg. a Memorandum Opinion of this Court;

*Durkin v. Commissioner,* 87 T.C. at 1374; *Siegel v. Commissioner,* 78 T.C. at 693.

The actual depreciation of motion pictures is not directly related to the appropriate depreciation expenses of contract rights to funds from the exploitation of such pictures. *Durkin v. Commissioner,* 87 T.C. at 1374. Thus, in the case of a taxpayer who owns such a contract right to funds from the exploitation of a motion picture, the income-forecast method requires the application of a fraction, the numerator of which is the taxpayer's net income from the contract right for the taxable period, and the denominator of which is the estimated total income from the contract right of the taxpayer. The cost of the contract right is multiplied by such fraction to calculate the depreciation allowable for a taxable year.

In these cases, the partnerships computed their depreciation deductions on the premise that they owned the respective films. Their depreciation deductions for each film were based on Columbia's gross receipts less distribution fees, releasing costs, motion picture association dues, and taxes for that film. Thus, the partnerships improperly used distributable gross receipts or, with respect to the motion pictures with third-party participations, distributable gross receipts plus third-party participations in calculating the depreciation deductions under the income-forecast method. Aside from all else,[16] the partnerships' calculations were excessive because they were based on the erroneous premise that the partnerships owned the films.

The parties agree that the partnerships are entitled to use the income-forecast method of depreciation. In order to give effect to this agreement, the partnerships will be required to recalculate their depreciation deductions based on their net earnings from their contract rights. During the years in issue, the values of these contract rights at the end of their anticipated useful lives were so negligible that salvage values need not be taken into account. In the numerator, the partnerships must use their net income figures shown in

---

[16]We observe that the method of computation of the depreciation deductions is not new matter as petitioners assert in certain dockets. If a notice of deficiency is broadly worded and the Commissioner later advances a theory not inconsistent with that language, the theory does not constitute new matter. *Sorin v. Commissioner,* 29 T.C. 959 (1958), affd. per curiam 271 F.2d 741 (2d Cir. 1959).

the summary schedules as the "net after debt service." In the denominator, the partnerships should have used the estimated net income from their contract rights. Under the circumstances of these cases, since the net incomes from the partnerships' contract rights over the period 1973-84 for Persky-Bright and the period 1975-84 for the other four films are known and shown on the summary schedules as "net after debt service," that figure for each film should be used as the denominator. These fractions are then to be multiplied against the cost of the contract rights as hereinbefore determined to arrive at the annual depreciation deductions until the cost basis of each contract right is recovered. In this manner, the depreciation deductions will be tied to the income produced by the contract rights for each period.

The Persky-Bright partner claimed an investment tax credit on his 1973 return, and the Vista partners claimed investment tax credits on their 1975 returns. Each 7-percent investment tax credit was based on that partner's distributive share of the entire purchase price for each film.

Although the statutory notices of deficiency did not mention section 48(k) and section 804 of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1591-1596, in disallowing the investment tax credits, we are satisfied that petitioners were well aware long before trial that respondent was relying on those provisions. This case is not like *Leahy v. Commissioner*, 87 T.C. 56 (1986), which was submitted fully stipulated. Accordingly, we have exercised our discretion under Rule 41 and allowed respondent to file amendments to his answers in the appropriate dockets to conform to the evidence and to assert that the investment tax credits should be disallowed under section 48(k) and section 804 of the Tax Reform Act of 1976. The Commissioner bears the burden of proving that these allegations are correct. Rule 142(a); *Durkin v. Commissioner*, 87 T.C. at 1382-1383.

Petitioners' position is that in 1973 and 1975, the years the films were placed in service, the investment tax credit was equal to 7 percent of the "qualified investment" under

section 46(a)(1).[17] The "qualified investment" was defined as the "applicable percentage" of the "basis" of the "qualifying property" placed in service by the taxpayer during the taxable year. Sec. 46(c)(1). When the useful life of the qualifying property was 7 years or more, the applicable percentage was 100 percent. Sec. 46(c)(2). Respondent's position is that under section 46(k) petitioners may claim an investment tax credit of 7 percent based on their "proportionate share of any loss which may be incurred with respect to the production costs of each film," and therefore their basis for calculating the credit is the cash (cash downpayment plus prepaid interest) which the respective partnership paid to Columbia for each film. Respondent also contends that under section 48(k)(2) for Vista and section 804(c)(1)(A) of the Tax Reform Act of 1976 for Persky-Bright, petitioners' applicable percentage is 66⅔ percent rather than the 100 percent claimed.

Section 48(k) was enacted by section 804 of the Tax Reform Act of 1976 to clear up past uncertainty regarding the availability of investment credit for motion picture films.[18] *Siegel v. Commissioner,* 78 T.C. at 695; see Staff of Joint Comm. on Taxation, General Explanation of Tax Reform Act of 1976 (H.R. 10612, 94th Cong., 2d Sess.), 1976-3 C.B. (Vol. 2) 188. Section 48(k)(1)(A) provides that a credit shall be allowed under section 38 to a taxpayer with respect to a motion picture film only if such film is "new section 38 property" which is a "qualified film" and only to the extent that the taxpayer has an "ownership interest" in such film. Under section 48(k)(1)(C), a taxpayer's ownership interest in a qualified film is to "be determined on the basis of his proportionate share of any loss which may be incurred with respect to the production costs of such film." The proportionate share of any loss which can be incurred with respect to production costs is the amount that the taxpayer's capital is at risk. Sec. 1.48-8(a)(4)(i), Income Tax Regs. The existence and extent of an ownership interest is

---

[17]The parties are in agreement that the 7-percent rate is applicable to both partnerships, that all the films were "new section 38 property" when acquired by the partnerships, and that the films are "qualified films."

[18]Sec. 48(k)(1) is applicable for films placed in service in any taxable year beginning before Jan. 1, 1975. Sec. 48(k)(1) and the remaining subsections of sec. 48(k) are applicable for taxable years beginning after Dec. 31, 1974. Sec. 804(d) and (e)(1) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1591, 1596.

determined at the time the film is placed in service. Sec. 1.48-8(a)(4)(ii), Income Tax Regs.; *Durkin v. Commissioner,* 87 T.C. at 1383. If a partnership has an ownership interest in a qualified film, its credit is apportioned among the partners on the basis of their capital at risk in the partnership at the time the film was placed in service. Sec. 1.48-8(a)(4)(iv), Income Tax Regs.

Pursuant to section 48(k)(2) (since no election was made under section 48(k)(3)), the applicable percentage under section 46(c)(2) for a qualified film would be 66⅔ percent regardless of the film's useful life. Congress specifically provided that if a film was placed in service prior to January 1, 1975 (since certain elections were not made), the applicable percentage under section 46(c)(2) is to be determined as if the useful life of the film expired at the end of the taxable year during which its aggregate depreciation deductions equal or exceed 90 percent of the basis of the film. Sec. 804(c)(1)(A), Tax Reform Act of 1976.

Petitioners assert that the retroactive application of section 48(k) and section 804 of the Tax Reform Act of 1976 to petitioners is unconstitutional under the due process clause of the Constitution, that our opinions in *Fife v. Commissioner,* 82 T.C. 1, 9-14 (1984), and *Wildman v. Commissioner,* 78 T.C. 943, 953-957 (1982), are incorrectly decided, and that the investment tax credit is a species of excise tax analogus to estate and gift taxes. We disagree with each assertion. Congress enacted the investment tax credit provisions as part of Subtitle A - Income Taxes. This Court considers the investment tax credit to be an income tax provision. *Fife v. Commissioner,* 82 T.C. at 12; *Wildman v. Commissioner,* 78 T.C. at 956. Petitioners acknowledge that the Vista partners were aware of the investment tax credit legislation which would be made effective for years beginning in 1975 but claim that the Persky-Bright partner had no notice when "Summer Wishes, Winter Dreams" was placed in service in 1973. As this Court has observed, a notice requirement has never been imposed with respect to retroactive tax legislation. *Fife v. Commissioner,* 82 T.C. at 13. We have carefully reviewed the *Fife* and *Wildman* opinions, and based on the reasoning in those opinions, we conclude that section 48(k) and its relevant subsections and

section 804 of the Tax Reform Act of 1976 are not so harsh and oppressive as to be unconstitutional.

In their supplemental brief, petitioners request that the Court apply the regulations under section 48(k)(1)(C) to allow petitioners the credit as lenders or guarantors if we hold, as we have, that the partnerships did not own the films. Those regulations provide that a taxpayer who, "at the time a film is first placed in service, is a lender or guarantor of all or a portion of the funds used to produce or acquire the film or part thereof" is to be treated as having a depreciable interest for purposes of the investment tax credit if such taxpayer "can look for repayment or relief from liability solely to the proceeds generated from the exhibition or disposition of at least a part of the film." Sec. 1.48-8(a)(4)(iii), Income Tax Regs. In his supplemental brief, respondent conceded that petitioners qualify as "lenders or guarantors" within the meaning of that regulation. Accordingly, we find that petitioners are entitled to claim investment tax credits as lenders or guarantors.

With respect to "Summer Wishes, Winter Dreams" the relevant provisions are section 48(k)(1)(C) and section 1.48-8(a)(4), Income Tax Regs. Those provisions also are relevant for the Vista films. Under those provisions, as detailed above, each partnership's "ownership interest" is limited to the amount at risk with respect to production costs and is apportioned among the partners. We find that for each of the five films, the ownership interest for computing the investment tax credit is limited to the partner's share of the amounts of cash downpayment plus prepaid interest the partnerships paid to Columbia. Sec. 48(k)(1)(C).[19]

With respect to the Vista films, section 48(k)(4)(B) further provides that in determining "qualified investment" for investment tax purposes under 46(c)(1), there shall be used (in lieu of the basis of the property) an amount equal to the qualified U.S. production costs. If a taxpayer purchases an interest in part of a film prior to its release, his qualified

---

[19]With respect to "Summer Wishes, Winter Dreams," respondent has conceded that the qualified U.S. production costs exceed the amount as limited by sec. 48(k)(1)(C). Since total production costs would also exceed that amount, it is unnecessary to consider sec. 804(c)(1)(B) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1591, 1595, which provides that in the absence of certain elections total production costs are to be taken into account in determining basis under sec. 46(c)(1) for pre-1975 years.

U.S. production costs are equal to the lesser of the total qualified U.S. production costs or the fixed purchase price of the film. Sec. 1.48-8(g)(1), Income Tax Regs. Respondent has conceded that the qualified United States production costs for each film exceed the fixed portion of the purchase price. Accordingly, we find that the qualified investment for purposes of computing the credit is equal to the partner's share of the amount of cash downpayment plus prepaid interest Vista paid to Columbia with respect to each film. Thus, the investment tax credit for the Vista films is determined on the basis of the same figure under both section 48(k)(1)(C) and section 48(k)(4)(B).

If we determine, as we have, that section 48(k) and section 804 of the Tax Reform Act of 1976 apply retroactively, petitioners concede that the Vista partners are entitled to an "applicable percentage" of 66⅔ percent rather than the 100 percent claimed originally. Since "Summer Wishes, Winter Dreams" was placed in service in 1973, the Persky-Bright partner in docket No. 3781-85 is entitled to have his "applicable percentage" calculated in the Rule 155 computation under the 90-percent rule set forth in section 804(c)(1)(A) of the Tax Reform Act of 1976.

Petitioners also contend that they are entitled to claim investment tax credits for residuals and third-party participations paid in connection with the Vista films. A taxpayer may claim an additional investment credit for subsequently incurred costs, provided that he has an ownership interest at the time such costs are incurred. Sec. 1.48-8(a)(4)(ii), Income Tax Regs. Respondent's position with respect to Vista is that these amounts were not costs "paid" or "incurred" by the partnerships.[20] We agree with respondent. Since Vista did not own the motion pictures, did not distribute the motion pictures, did not determine any of the costs in connection therewith, and only received payments which were net of these costs, we conclude that these costs were too remote from Vista to be considered paid or incurred by that partnership. *Durkin v. Commissioner,* 87

---

[20]Unlike this case, in *Durkin v. Commissioner,* 87 T.C. 1329 (1986), respondent had conceded that certain participations were incurred or paid and contended that these amounts be allocated between Paramount and the partnerships. The Court in *Durkin* made such an allocation based on respondent's concession. That concession, of course, is not applicable in this case.

T.C. at 1387-1388. As in *Durkin,* in the context of residuals and participation interests, we decline to define "paid" or "incurred" to include the diversion of funds to which the partnership would have some right if the underlying cost had not been incurred; the partnership's interests in the proceeds were net of these costs.

Accordingly, we conclude that each partner's investment tax credit with respect to each film is computed based on the respective partnership's cash investment (cash downpayment plus prepaid interest), multiplied by the 66⅔-percent applicable percentage in the case of Vista and by the applicable percentage in the case of Persky-Bright, multiplied by the agreed 7-percent credit rate, multiplied by the partner's partnership share. See *Crum v. Commissioner,* T.C. Memo. 1984-328.

Petitioners contend that no additional interest is payable under section 6621(c). Section 6621(c) provides for an increase in the rate of interest to 120 percent of the otherwise applicable rate with respect to a "substantial underpayment" (an underpayment of at least $1,000) in any taxable year "attributable to 1 or more tax motivated transactions."[21] The additional interest accrues after December 31, 1984, regardless of the filing date of the returns. *DeMartino v. Commissioner,* 88 T.C. 583 (1987); *Solowiejczyk v. Commissioner,* 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Moreover, petitioners had a fair opportunity to present evidence and to brief the underlying facts leading to our determinations on this issue. *Johnson v. Commissioner,* 85

---

[21]SEC. 6621(c). INTEREST ON SUBSTANTIAL UNDERPAYMENTS ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS—

\*　　　\*　　　\*　,　　　\*　　　\*　　　\*　　　\*

(3) TAX MOTIVATED TRANSACTIONS.—

    (A) IN GENERAL.—For purposes of this subsection, the term "tax motivated transaction" means—

        (i) any valuation overstatement (within the meaning of section 6659(c)),

        (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8),

        (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092),

        (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and

        (v) any sham or fraudulent transaction.

T.C. 469, 483 (1985); see *Law v. Commissioner,* 84 T.C. 985, 990 (1985).

The partnerships (and thus petitioners) claimed depreciation and investment tax credits on their interests in the films based on the total purchase price of the films. We have determined that the basis of their income interests in each of the films was substantially less. A valuation overstatement under section 6659(c) is a tax-motivated transaction under section 6621(c)(3)(A)(i). Section 6659(c) provides that "there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." On its 1973 return, Persky-Bright claimed a basis of $2 million for "Summer Wishes, Winter Dreams" and we allowed a basis of $327,000 for its income interest in that film. On its 1975 return, Vista claimed an aggregate basis of $29 million for the four films, and we have determined that the aggregate basis of its income interests in the four films was $6,020,584. Persky-Bright claimed a basis for its interest in "Summer Wishes, Winter Dreams" which exceeds the amount we have determined to be the correct amount by approximately 610 percent. Vista claimed a basis for its four films which exceeds the amount we have determined to be the correct amount by approximately 480 percent. Thus, the basis or adjusted basis used by the partnerships on their initial and subsequent returns during the years in issue exceeds the correct amount by 150 percent or more. Accordingly, the resulting partial disallowances of the claimed depreciation deductions are attributable to tax-motivated transactions.[22] See *Schwartz v. Commissioner,* T.C. Memo. 1987-381.

Although respondent also asserts that the investment tax credits claimed by the partnerships are based on valuation overstatements, he has overlooked the grounds for the

---

[22]We recognize that the partnerships claimed a basis in the films and we have determined that the partnerships had basis only in intangible contractual rights in the films. However, analyzing the valuation overstatements from the perspective of the property rights being different would require comparing each partnership's claimed basis in each film to each partnership's actual zero basis in the film, which would result in the same conclusions. See *Zirker v. Commissioner,* 87 T.C. 970 (1986).

partial disallowances of the investment tax credits. Those disallowances were attributable to the application of section 48(k) and section 804 of the Tax Reform Act of 1976. These provisions are not encompassed by section 6621(c)(3) and section 301.6621-2T, Temporary Proced. & Admin. Regs., T.D. 7998, 49 Fed. Reg. 50390 (Dec. 28, 1984). Accordingly, the partnerships' claims of investment tax credits in excess of the amounts allowed were not attributable to tax-motivated transactions.

We have disallowed the partnerships' claimed deductions for interest paid to Columbia (including the prepaid interest we have capitalized) because we found that the nonrecourse notes underlying such interest were not bona fide debts. Section 6621(c)(3)(A) lists as one category of tax-motivated transactions "any sham or fraudulent transaction." We believe that a holding that a debt is not a bona fide debt is indistinguishable from a holding that such a debt is a sham within the meaning of section 6621(c)(3)(A)(v). See *Schwartz v. Commissioner*, T.C. Memo. 1987-381. We hold that the claimed interest deductions were the result of tax-motivated transactions and accordingly are disallowed.

Pursuant to section 6621(c)(3)(A)(iv), the Treasury has promulgated temporary regulations which prescribe accounting methods that may "result in a substantial distortion of income." See sec. 301.6621-2T, Temporary Proced. & Admin. Regs. These regulations provide, in relevant part:

Q-3: What accounting methods may result in a substantial distortion of income for any period under [section 6621(c)(3)(A)(iv)]?

A-3: A deduction or credit disallowed, or income included, in any of the circumstances listed below shall be treated as attributable to the use of an accounting method that may result in a substantial distortion of income and shall thus be a tax motivated transaction that results in a tax motivated underpayment:

\* \* \* \* \* \* \*

(9) In the case of a taxpayer who computes taxable income using the cash receipts and disbursements method of accounting, any deduction disallowed for any period because (i) the expenditure resulting in the deduction was a deposit rather than a payment, (ii) the expenditure was prepaid for tax avoidance purposes and not for a business purpose, or (iii) the deduction resulted in a material distortion of income (see, e.g. Rev. Rul. 79-229, 1979-2 C.B. 210).

Persky-Bright deducted management fees of $75,000 and $15,000 in 1973 and 1975, respectively, for a total of $90,000. The parties stipulated that only $18,000 of these amounts was an ordinary and necessary expense fully deductible in 1973. Vista deducted management fees of $582,936 and $652,356 in 1974 and 1975, respectively, for a total of $1,235,286. The parties stipulated that only $247,057 of these amounts was an ordinary and necessary expense fully deductible in 1974. The parties further stipulated that 60 percent of the management fees ($54,000 for Persky-Bright and $741,170 for Vista) "shall be added" to the partnerships' basis in the films or "shall be capitalized and amortized" over 10 years. Under Rule 91(e), these are conclusive admissions by the parties. To the extent the amounts deducted as management fees are not depreciated or amortized pursuant to the stipulations in 1973 and 1975 by Persky-Bright and in 1974 and 1975 by Vista, the disallowances are material distortions of income within the meaning of section 301.6621-2T, Q & A-3 (9)(iii), Temporary Proced. & Admin. Regs. Thus the accounting methods used by the partnerships resulted in a substantial distortion of income under section 6621(c)(3)(A)(iv). Accordingly, the underpayments from such disallowed deductions are attributable to tax-motivated transactions.

On brief, petitioners in docket Nos. 21771-81 and 18721-85 erroneously assert that disallowances of carrybacks in 1971 and 1972 may be involved in these cases on the section 6621(c) issue. On reply brief, respondent also erroneously asserts that section 6621(c) applies to the loss carryback years in these cases. We have found no disallowances of carrybacks other than the years and dockets referred to by petitioners and those disallowances are unrelated to Vista. In docket No. 21771-81, the disallowance of the investment tax credit carryback relates to a carryback from 1974 to 1971 and 1972, whereas the Vista investment tax credit was claimed in 1975. The carryback from 1974 was unrelated to Vista and thus is not before the Court in that docket. In docket No. 18721-85, examination of the 1974 income tax return discloses that the disallowed carryback to 1971 of $9,139.78 is the amount of itemized deductions in excess of adjusted gross income. Although the

record is not entirely clear, this amount apparently was improperly claimed as a net operating loss since nonbusiness deductions are deductible only to the extent of nonbusiness income. Sec. 172(d)(4). Since there is no evidence showing that the disallowance of any carryback relates to Persky-Bright or Vista, we need not consider the application of section 6621(c) to disallowed carrybacks. But see *Nielsen v. Commissioner,* 87 T.C. 779 (1986), where we held that an item carried back from a later year to an earlier year is "attributable to" the adjustment in the later year in the context of an addition to tax under section 6659(a) for a valuation overstatement.

Section 6621(c) does not apply in docket No. 3781-85 for the year 1977 since the total underpayment was less than $1,000. With that exception, the sanctions of section 6621(c) may apply in all dockets if the amount of the underpayment attributable to tax-motivated transactions exceeds $1,000 for a specific year. The application of the section 6621(c) sanctions ultimately will have to be determined in the course of the various Rule 155 computations.

As a result of our resolution of the above issues, we find it unnecessary to address other contentions raised by the parties.

> *Decision will be entered under Rule 155 in docket No. 4505-82 and docket No. 3781-85.*

> *Appropriate orders will be issued in all other dockets.*